**CBS INC., American Broadcasting Companies, Inc., National Broadcasting Company, Inc. and Miami Daily News, Inc., Plaintiffs,**

v.

**Jim SMITH, in his official capacity as Secretary of State of the State of Florida, and David Leahy, in his official capacity as the Supervisor of Elections of Dade County, Florida and as representative of a defendant class of all County Supervisors of Elections in the State of Florida, Defendants.**

No. 88–0283–CIV.

United States District Court, S.D. Florida.

March 2, 1988.

As Amended April 5, 1988.

Donald M. Middlebrooks, Steel Hector & Davis, Miami, Fla., Floyd Abrams, Cahill Gordon & Reindel, New York City, Joseph P. Averill, Miami, Fla., for plaintiffs.

Arden Siegendorf, Asst. Atty. Gen., State of Fla., Dept. of Legal Affairs, Tallahassee, Fla., Thomas W. Logue, Asst. Co. Atty., Miami, Fla., for defendants.

## ORDER OF PRELIMINARY INJUNCTION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCUS, District Judge.

THIS CAUSE has come before the Court upon the Emergency Motion by the Plaintiffs CBS Inc. ("CBS"), American Broadcasting Companies, Inc. ("ABC"), National Broadcasting Company, Inc. ("NBC") and Miami Daily News Inc. ("The Miami News") for a preliminary injunction enjoining the Defendants Secretary of State Jim Smith and David Leahy, Supervisor of Elections of Dade County, Florida from enforcing Fla.Stat. § 102.031(3)(a), (b), as amended. At issue is a provision of Florida law that provides that "[n]o person ... or other group or organization may solicit voters within 150 feet of any polling place, or polling room where the polling place is a shopping center or mall, on the day of any election." Fla.Stat. § 102.031(3)(a). To "solicit" is defined to include, among other things, "soliciting or attempting to solicit any ... opinion ... for any purpose." Fla. Stat. § 102.031(3)(b).

By this emergency application, the Plaintiffs seek preliminarily to enjoin the Defendants from enforcing or threatening to enforce this statute against the peaceful and orderly solicitation of opinions during the up-coming presidential primary on March 8, 1988 ("Super Tuesday"), including the conduct of interviews and exit polls by the media within 150 feet of the voting place.

In view of the immediate time constraints presented by the emergency motion and the important issues at stake, we set this cause down for an evidentiary hearing and argument on February 26, 1988, upon three days notice to all parties.

Because we have concluded that this statute's prohibitions are inconsistent with the commands of the First and Fourteenth Amendments to the United States Constitution, we grant the preliminary relief sought by these Plaintiffs. On the record now before us, we hold that Fla.Stat. § 102.031(3)(a) impermissibly restricts Plaintiffs from gathering and reporting basic information about the political process to the general public on election day. This statute broadly and wrongfully restricts virtually every form of expression between persons within 150 feet of the polling place; it neither exempts from its ambit streets or sidewalks or other public forums traditionally open to the public for expressive purposes; and it is neither narrowly tailored to accomplish the significant state interest in protecting the orderly functioning of the electoral process, nor is it the least restrictive means available for accomplishing that legitimate goal.

Based upon the evidence presented, the pleadings and memoranda filed and argument of counsel, we make the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A. THE PARTIES

1. The Plaintiff CBS is a corporation organized and operating under the laws of New York state. CBS is a broadcast news organization engaged in the gathering of news, the production of news programming, and the dissemination of news through the CBS network of wholly owned and affiliated television and radio broadcasting stations in the State of Florida and throughout the country. Whenever an important presidential primary or an election of national significance is held, CBS News presents special programming or coverage of that election, broadcast nationwide over a network of radio and television stations.

2. The Plaintiffs ABC and NBC similarly are organized and engaged in the business of gathering, producing, and disseminating the news to affiliated broadcast stations in this State and throughout the country.

3. Plaintiff The Miami News is a Florida corporation engaged in the gathering and dissemination of news to the general public; it owns and publishes *The Miami News*, a daily newspaper of general circulation in Dade County, Florida.

4. Defendant Jim Smith ("Smith") is Secretary of State of Florida and has been sued in his official capacity. As Secretary of State, Smith is the chief election officer in Florida.

5. Defendant David Leahy ("Leahy") is the Supervisor of Elections for Dade County, Florida; he, too, is named only as a Defendant in his official capacity as Supervisor of Elections. As Supervisor of Elections, Leahy is charged by law with the duty to determine in each precinct the area within which soliciting of opinion is unlawful, and to take any reasonable action necessary to ensure order at the polling places throughout the county. Fla.Stat. § 102.031(3)(c). The class represented by Leahy consists of all supervisors of elections of the 67 counties throughout Florida.

## B. BACKGROUND OF FLA.STAT. § 102.031(3)

6. The statutory history leading to the passage of Fla.Stat. § 102.031(3) is instructive. Florida had two statutes restricting access to the areas surrounding the State's polling places in 1984. The first, section 101.121, prevented non-voters from coming within 15 feet of any polling place. That section excepted official election personnel and the sheriff from its prohibitions.

The second provision, section 104.36, was more specific in its reach, and, like the statute at issue today, it prohibited any solicitation of votes, contributions or opinions, although within *100 yards* of any polling place:

Any person who, within 100 yards of any polling place on the day of any election, distributes or attempts to distribute any political or campaign material; solicits or attempts to solicit any vote, opinion, or contribution for any purpose; solicits or attempts to solicit a signature on any petition; or, except in an established place of business, sells or attempts to

sell any item is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

In 1984, the Florida legislature passed Chapter 84–302, which amended section 104.36 to specify that the 100–yard restricted zone contained in the statute

shall be measured from the entrance to the room or other area in which the voting equipment or pollworkers are housed.

7. Section 104.36 was held unconstitutional on First Amendment grounds in *Clean–Up '84 v. Heinrich*, 582 F.Supp. 125 (M.D.Fla.1984) (*"Clean–Up '84"*). In that case, the plaintiff, a political action committee seeking to solicit signatures on initiative petitions, obtained a preliminary injunction prohibiting enforcement of the statute on the day of the November 1984 general election. Soon thereafter, the court, after a non-jury trial on the merits, struck down the statute as unconstitutional, *Clean–Up '84 v. Heinrich*, 590 F.Supp. 928 (M.D.Fla.1984), and issued permanent injunctive relief barring its enforcement. The United States Court of Appeals for the Eleventh Circuit affirmed this decision in *Clean–Up '84 v. Heinrich*, 759 F.2d 1511 (11th Cir.1985).

8. In October 1985, the Spanish International Communications Corporation, which operates television Channel 23 in Miami, obtained a temporary restraining order in this Court enjoining the State's threatened enforcement of section 104.36—the same law struck down in *Clean–Up '84* —against Channel 23 to prevent it from exit polling within 300 feet of the polling place in the November 1985 election. *Spanish International Communications Corp. v. Firestone*, No. 85–3453–CIV–Hastings (S.D.Fla. Nov. 1, 1985). The order held that the 100–yard prohibition would "destroy the validity of Plaintiff's 'exit-polling' procedures and cause loss of vital electoral information permanently." *Id.* at 2.

9. Effective January 1, 1986, the Florida legislature amended section 102.031 permitting any person or group to solicit voters within 100 feet of a polling place so long as notice was given to the appropriate

supervisor of elections at least three days prior to the election. At the same time, the Florida legislature also amended section 101.121 to expand the zone within which non-voters were excluded to *50 feet* from the polling place. As a result, during the 1986 election, the media was permitted to engage in journalistic activities within 100 feet of polling places in the State of Florida.

10. In 1987, the Florida legislature once again amended section 102.031(3)(a) to create a new and expanded zone in which the solicitation of votes, opinions, or contributions was flatly prohibited. The restricted area at issue, unlike the one contained in section 104.36, is to be measured from the polling place, defined under section 97.021 as "the building which contains the polling room where ballots are cast" rather than from the polling room itself. Thus, although the distance was half that originally set forth in section 104.36, generally it is measured from a further point. The new section, as amended, reads in its entirety:

(3)(a) No person, political committee, committee of continuous existence, or other group or organization may solicit voters within 150 feet of any polling place, or polling room where the polling place is a shopping center or mall on the day of any election.

(b) For the purpose of this subsection, the term "solicit" shall include, but not be limited to, soliciting or attempting to solicit any vote, opinion, or contribution for any purpose; distributing or attempting to distribute any political or campaign material; soliciting or attempting to solicit a signature on any petition; and selling or attempting to sell any item, except within an established place of business.

(c) Each supervisor of elections shall determine and inform the clerk of each precinct of the area within which soliciting is unlawful, based on the particular characteristics of that polling place. The supervisor or the clerk may take any reasonable action necessary to ensure order at the polling places affected by such soliciting, including designating a specific limited area for soliciting and having disruptive and unruly persons removed by law enforcement officers from the polling place.

11. The legislature also amended section 101.121, to redefine that section's restricted zone to 50 feet from a polling *room*, rather than polling *place*. Section 101.121 does, however, remain inapplicable to private property. Notably, the Plaintiffs do not challenge the restricted zone of 50 feet as measured from a polling room.

12. On February 26, 1988, the Honorable Howell W. Melton, United States District Judge, Middle District of Florida, entered a preliminary injunction enjoining the Sheriff of Duval County and the Supervisor of Elections from Duval County from enforcing or threatening to enforce Fla.Stat. § 102.031(3) against "the peaceful, orderly and nondisruptive solicitation of signatures for plaintiff's initiative petitions during the March 8, 1988, presidential preference primary near any polling place." *Florida Committee for Liability Reform v. McMillan*, 682 F.Supp. 1536, 1543 (M.D.Fla.1988). That injunction arose from a suit brought by the Florida Committee for Liability Reform, a political committee that sought to solicit signatures for a petition urging a referendum on a proposed state constitutional amendment, from registered voters at polling places on March 8, 1988. Judge Melton found that the Plaintiff had a substantial likelihood of prevailing on the merits, concluding that the same statute at issue before this Court was overbroad both as to its subject matter and its geographic application, and that there were available less restrictive means to achieve the governmental ends.

13. The parties to this lawsuit have agreed that Judge Melton's recent order, although relevant to the issues we now face, does not resolve the basic question of whether section 102.031(3)(a), (b) unconstitutionally prohibits the solicitation of voter opinion within 150 feet of the polling place.

## C. THE HEARING

14. An emergency preliminary injunction hearing was conducted by this Court

on February 26, 1988. At the hearing, Plaintiffs presented the live testimony of Warren Mitofsky, Director of the Election and Survey Unit of CBS News; affidavits of Paul Kaplan, City Editor of *The Miami News,* and Everett Carl Ladd, professor of political science and Director of the Institute for Social Inquiry at the University of Connecticut and Executive Director of the Roper Center for Public Opinion; certain documentary evidence; and a short film clip from CBS News. The Defendants presented the live testimony of David Leahy and portions of transcripts of testimony taken at a hearing before Judge Melton on February 18, 1988, from Donald L. Hersey, Sr., Supervisor of Elections for Putnam County and Lee Jarrell, Assistant Supervisor of Elections for Duval County, along with certain documents.

15. Warren Mitofsky testified that as an important part of its coverage of elections, CBS News conducts "exit polls" throughout the United States. These polls involve the collection of data from a random sample of voters at a sample of polling places on primary and election days. The poll is conducted by interviewing voters in a scientifically predetermined pattern as they leave the voting place. The information gathered through exit polls is included in CBS News' election night coverage and also is used in post-election studies and analyses of the election results.

CBS first began using the exit poll in 1967. Today CBS News conducts exit polls in most states, along with a national poll in connection with its coverage of the important 1988 presidential primaries and the November 1988 election. Plaintiffs NBC and ABC have also engaged in the conduct of exit polls throughout the country. These polls are designed to gather information about the voters' reactions in particular states to contests for President, Governor or Senator in applicable years, as well as the voters' opinions on issues of local and national importance. Additionally, the exit polls seek factual information from the voters as well, including such information as age, sex, race, religion, and family income.

Mitofsky indicated that CBS planned to conduct both statewide and regional polls—including one in Florida—in connection with the March 8, 1988 presidential primaries. Mitofsky further opined that the information collected in Florida is extremely important to the analysis of attitudes and voting patterns throughout the southern part of the country, as a result of Florida's size, its explosive rate of growth, and its demographic diversity. This information would be used by CBS in election night coverage to formulate projections of the outcome of certain races, and to highlight and explain demographic patterns, trends, and issues of public importance. Moreover, CBS compiles the information gathered through its exit polls in a computer report from which detailed analyses of voting behavior can be made. The data compiled from these exit polls is subsequently archived at the Roper Center at the University of Connecticut and the University of Michigan, and is available to social scientists, historians and other students of voting behavior nationwide.

16. Mitofsky further explained the manner of conducting exit polls: Throughout Florida, at 50 to 75 pre-selected precincts, at least one polling reporter clearly identifiable by a CBS News logo, is assigned. The reporter is instructed to ask the exiting voter in a business-like fashion to fill out a basic questionnaire which takes some two to five minutes to complete. The polls would be conducted at approximately *ten* selected precincts in Dade County. (There are some five hundred precincts in all of Dade County.)

17. Mitofsky, undisputably a qualified expert in the field of polling voter preferences, testified that exit polls provide very reliable data about voter behavior precisely because of the near certainty that the person interviewed has actually voted. He explained that the greater the distance from the polling place that the reporter is required to stand, the less reliable the gathered information becomes. As the distance increases, the likelihood of the voter melding into a crowd of non-voters, or otherwise leaving increases markedly. Moreover, as the distance increases, it becomes more dif-

ficult to discern the voters from the non-voters. Mitofsky unequivocally testified that a 150–foot distance such as the one contained in Fla.Stat. § 102.031(3)(a) would destroy the ability effectively to conduct exit polls in Florida. Indeed, Mitofsky said that in 1984, when Florida law imposed a 300–foot restriction, exit polls were not used by CBS because they would not have yielded reliable information.

Dr. Ladd also indicated in his affidavit that exit polls have become a prime source of election data widely used by political writers and scholars. Indeed, Ladd characterized exit polls as "a priceless resource in the study of voter behavior and elections. There exists no other polling technique that provides as reliable a source of information on voters and voting behavior." (Ladd Affidavit at 7; Plaintiffs' Exhibit 7). As a result of the extensive nature of the information available because of exit polling, these polls have become a prime source of data for political contests and scholars.

18. Finally, Mitofsky testified that in the twenty years he has supervised the acquisition and analysis of polling information for CBS, he is unaware of any official complaint that a CBS poll reporter interfered with any voter at the polls, or in any way discouraged voters from voting as a result of conducting exit polls. He testified that only one time in 1986 had he learned that an interviewer in the mid-west had been rude at a polling place. He also explained that in light of the great number of precincts and the very small number actually sampled, the probability of more than one network pollster being at the same precinct at the same time was very small.

19. The Miami News also offered an affidavit of Paul Kaplan, its City Editor. Kaplan explained that as an integral part of its election coverage, the Miami News, being an afternoon paper, interviews voters after they have voted at polling places in specific and predetermined communities on election day. These interviews are designed to gather information and opinions on issues of public importance and to explore the voters' reactions to candidates and issues. Kaplan indicated that in the past his reporters had conducted exit interviews within 150 feet of the polling place without incident, but that voter interviews could not be conducted reliably at a distance of 150 feet from the polls.

20. The defense broadly posited two interests served by the statute in question: first, that the statute "creates a zone of privacy for voters consistent with the State's recognized policy determination to establish a protected area of voter sanctity and electoral decorum" (Defendant Jim Smith's Memorandum of Law in Opposition to Emergency Motion for Preliminary Injunction at 2); and second, inasmuch as some voting places are situated on private property, including churches, by limiting the nature and extent of solicitation at or near the polling place, the statute tends to increase the willingness of private owners to make their property available to the State for this purpose.

21. David Leahy, Supervisor of Elections for Dade County, testified at length as to the wisdom and efficacy of Fla.Stat. § 102.031. He testified that Dade County utilized approximately 500 polling places and that a wide variety of public as well as private property was used in order to conduct elections. Among the facilities employed as polling places were the following: public schools (132); churches and synagogues (113); community centers (68); apartment buildings, condominiums, and hotels (46); parks (35); legion posts and club facilities (34); fire stations (22); municipal buildings (16); private schools (15); shopping centers and malls (11); libraries (4); armories (3); bowling alleys (2); a museum (1); a dog track (1); a boxing gym (1). Leahy explained that as a matter of course, he seeks to acquire polling places at public buildings first, and then, if none is available at a convenient location within the precinct, private property is sought.

22. Leahy testified that between 1984 and 1986 Dade County lost 23 of some 500 polling places as a direct result of campaign and signature solicitation at the polls. Most of the lost facilities were church property, and involved churches

which were unhappy with the nature of solicitation at or near the polling place by groups promoting such unwelcome causes as casino gambling and a state-wide lottery. Leahy conceded, however, that none of the "lost" facilities was in any way the result of conducting media interviews or exit polls. Leahy also conceded that he was unaware of exit pollsters or reporters generating noise at a polling place, or leaving paper or litter at the polling place, or otherwise disrupting any polling place in any Florida election. He testified that exit polls have the "potential" of generating "problems" at the polling places, perhaps by "creating the perception" that there is a long voting line at a particular voting place and thereby discouraging voters. However, he acknowledged that he had no actual experience with exit pollsters causing any problems, and he could not say to what extent, if at all, a problem such as congestion in or near any polling place would result from such media activity. Indeed, no evidence has been presented that exit polls or other voter interviews by journalists in any way have disrupted any polling place in this state.

23. At the request of this Court, Leahy attempted to ascertain to what extent at Dade County precincts a 150–foot zone from the polling place would encompass within its geographic ambit adjacent public sidewalks, public streets and the like. Five polling places apparently were randomly selected and the distance measured from each polling place to the sidewalk or the street. Notably, Leahy indicated that four of the five polling precincts sampled included within 150 feet of the polling place, public streets, sidewalks or parking facilities. In one instance, the distance measured from the polling place to the adjacent sidewalk or parking lot was only 32 feet; in another, 80 feet; in a third, some 139 feet; in a fourth, 145 feet; and in the last one, 174 feet.

24. The application of a 150–foot boundary from the 500–plus polling places in Dade County would in essence proscribe solicitation of all voter opinion on public sidewalks and public streets, in public parks, and at or near at least nine seats of government or municipal buildings.

25. The Defendants also offered portions of transcript testimony given by Donald L. Hersey, Supervisor of Elections for Putnam County and President of the Florida State Association of Supervisors, and Lee Jarrell, Assistant Supervisor of Duval County, at a hearing held before Judge Melton. Among other things, Hersey testified, as Leahy had, that one of the central concerns prompting the Florida legislature to enact the 1987 amendments was the objection interposed by churches to the content of specific solicitations for signatures with respect to such controversial subjects as the legalization of casino gambling at or near the polling place. Hersey said that some churches actually withdrew polling places as a result of signature solicitations, and he feared that others would too. Jarrell corroborated this testimony. Hersey further indicated that he had received numerous complaints from people about candidates who posted campaign literature within the proscribed zone. Hersey offered no testimony, however, as to any problem, actual or feared, resulting from exit polling or journalistic interviews within 150 feet of the polling place anywhere in the state.

26. Hersey testified further that he employs a deputy sheriff at each polling place in order to maintain order. Finally, Hersey indicated that he would not attempt to enforce the statute's ban on solicitation within 150 feet of a polling place when the activity occurred on private property. He added that this was his personal interpretation of the statute, and that other supervisors might interpret the statute differently.

27. Leahy testified that he intends to enforce the prohibitions contained in section 102.031(3) against *all* exit polling and journalistic interviews within 150 feet of the polling place.

## II. CONCLUSIONS OF LAW

1. Pursuant to Fed.R.Civ.P. 23, this Court certifies as a class all Supervisors of Elections in the State of Florida, and certifies David Leahy, as Supervisor of

Elections for Dade County, Florida, as the class representative. The Defendant class is comprised of all county Supervisors of Elections, who are the local officials responsible for overseeing elections in each county. Fla.Stat. § 98.161. Each Supervisor is empowered to enforce the provisions of the Florida Election Code, including the statute at issue here, section 102.031. We are satisfied that the requirements of Rule 23, Fed.R.Civ.P., have been met fully: (1) the Defendant class of Supervisors of Elections for each of the 67 counties in Florida is so numerous that joinder of all members is impracticable; (2) the Plaintiffs have raised only one major question of law—whether the prohibition against soliciting by the media of an opinion from voters within 150 feet of polling places violates the First Amendment—and it is common to the entire Defendant class; (3) the defenses raised by Supervisor Leahy are surely typical of the defenses of the entire Defendant class; and (4) Supervisor Leahy, empowered with the same election law enforcement and oversight functions as every other county Supervisor, can fairly and adequately protect the interests of the Defendant class of Supervisors. Moreover, Plaintiffs' action is properly maintainable as a class action under Rule 23(b)(1)(A) inasmuch as there are 67 county Supervisors throughout the State and the prosecution of separate actions against individual members of the Defendant class would create a substantial risk of inconsistent or varied adjudications with respect to individual members of the class and would establish incompatible standards of conduct for Plaintiffs in each county.

2. At the outset we emphasize that "[a] preliminary injunction ... is an extraordinary remedy, and the boundaries within which the district court may exercise its discretion are clearly marked." *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.,* 697 F.2d 1352, 1354 (11th Cir.1983). It is clear that the moving party seeking preliminary injunctive relief pursuant to Rule 65, Fed.R.Civ.P., bears the burden of establishing four essential prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable inju-

ry unless the injunction issues; (3) a balance of hardships favoring the movant; and (4) the advancement of some discernable public interest by entering injunctive relief. *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974); *see also Cunningham v. Adams,* 808 F.2d 815, 819 (11th Cir.1987); *Cate v. Oldam,* 707 F.2d 1176, 1185 (11th Cir.1983).

■ 3. At issue today is whether the state can prohibit the media from the solicitation of all opinion from the voters of Florida, within 150 feet of the polling place, without regard to whether the conduct is disruptive, and without concern as to whether the prohibition encompasses public streets, public sidewalks, public parks or other traditionally public forums. Indisputably, Fla.Stat. § 102.031(3) prohibits the Plaintiffs' ability to speak freely and to gather opinion about the electoral process from those who have voted in this State. It is equally clear that the conduct of exit polling and journalistic interviews are protected by the First Amendment guarantees of free speech and free press. *Daily Herald v. Munro,* 838 F.2d 380 (9th Cir.1988); *Florida Committee for Liability Reform v. McMillan,* 682 F.Supp. 1536 (M.D.Fla. 1988); *Clean–Up '84 v. Heinrich,* 759 F.2d 1511 (11th Cir.1985). The State has defended its statute and its power to so limit the Plaintiffs as being necessary to the orderly functioning of the electoral process. These interests, too, are substantial. Because we believe, however, that this statute broadly and wrongfully restricts virtually every form of expression within a 150–foot zone, neither exempting from its ambit streets or sidewalks or other public forums traditionally open to the public for expressive purposes, nor otherwise tailoring its proscriptions in a narrow manner to achieve its significant purpose, a preliminary injunction must issue.

■ 4. The gathering of news of political consequence is a necessary corollary to the freedom to report about politics and government. *See Richmond Newspapers Inc. v. Commonwealth of Virginia,* 448

U.S. 555, 576, 100 S.Ct. 2814, 2827, 65 L.Ed. 2d 973 (1980). Simply put, newsgathering is a basic right protected by the First Amendment; "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972); *In re The Express–News Corp.*, 695 F.2d 807, 808 (5th Cir.1982). And, indeed, without the ability to collect information, viewpoints, and opinions from voters, the right to report and publish political news would be left with little means of fulfillment. Fla. Stat. § 102.031 constricts not only the ability to gather important news about voters' preferences and opinions, but perhaps even more basic, the right to speak freely about matters of undisputed public importance. We add that while the exact contours of the protections afforded various categories of speech by the First Amendment have been widely debated "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). The ability to speak on matters of public importance is fundamental to self-government.

5. The Plaintiffs have a substantial likelihood of prevailing on the merits in this case precisely because section 102.031 strikes so broadly at protected expressive activities. The statute forbids "soliciting or attempting to solicit any ... opinion ... for any purpose ..." Fla.Stat. § 102.031(3)(b). By its literal terms, the solicitation of all "opinion" from voters within 150 feet of the polling place is outlawed. All exit polling and reporters' interviews, whether disruptive or not, therefore are barred. We add that there has been no showing that exit polls or other voter interviews by journalists in any way have disrupted any polling place in this state. Nor has any evidence been presented, no less convincing proof, that the presence of reporters near a polling place tends to discourage anyone from voting. Moreover, while section 102.031 restricts a journalist's ability to solicit or gather opinions from voters within 150 feet of the polling place,

the statute does not, by its terms, prohibit a journalist or anyone else from entering that zone to observe and report on voter turnout. Nor does this statute appear to bar reporters from questioning non-voters about their opinions within 150 feet; nor, finally, does it literally proscribe the gathering of "facts" as opposed to "opinion." Thus, to the extent that section 102.031(3) was codified essentially to restrict the number of people who may enter the zone and thereby maintain the sanctity and decorum of the polling place, it does not go far enough to accomplish that task. The failure of the statute to include activity that could very well defeat its intent suggests that this interest is not at the heart of the statute's purpose.

The Florida statute at issue is fatally overbroad then because it prohibits even peaceful, thoughtful discussions with voters regarding how they voted and why. Under Florida law, no person may approach a voter within the zone and ask the voter his or her opinion. It does not matter that the voter wants to speak or that the reporter wishes to listen, or that the discussion is wholly non-disruptive.

6. Fla.Stat. § 102.031 is overbroad in another sense: the 150–foot zone as measured from the building entrance housing a polling place does not exempt public streets, sidewalks, and parks. These traditional, "quintessential public forums"— "places which by long tradition or by government fiat have been devoted to assembly and debate," *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983), are entitled to the protection of the First Amendment. As Justice Roberts wrote for a plurality of the Supreme Court many years ago:

Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thought between citizens and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges,

immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Hague v. C.I.O.*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939). Any restrictions on expressive activities in public areas must be subject to the strictest scrutiny. The record evidence has established that a 150–foot zone created by statute would encompass within its geographic ambit in Dade County public sidewalks, streets and parks, along with at least nine seats of local government.

We add that in this respect, section 102.031(3) is similar to section 104.36, which was held to be an unconstitutional infringement of the freedom of speech in *Clean-Up '84 v. Heinrich*, 759 F.2d 1511, 1514–15 (11th Cir.1985), *aff'g* 590 F.Supp. 928 (M.D. Fla.1984). In that case, the Eleventh Circuit struck down the statute for overbreadth because the 300–foot radius then at issue included within its scope areas such as private homes and businesses, "where the gathering of signatures could impose no threat to the voting process." *Id.* See also *Daily Herald v. Munro, supra,* at 384 ("[P]ublic areas within 300 feet of entrance to polling place are traditional public forums because they traditionally are open to the public for expressive purposes, including random interviews by reporters....").

7. The State surely has a substantial interest in preserving the fairness and integrity of elections and ensuring a protected area of voter sanctity and decorum, for the right to vote is a fundamental one. *Reynolds v. Sims*, 377 U.S. 533, 554–55, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964). *See also Brown v. Hartlage*, 456 U.S. 45, 52, 102 S.Ct. 1523, 1528, 71 L.Ed.2d 732 (1982). The problem we face is not in positing this undeniably important state interest, but rather the manner in which the statute attempts to serve it.

Because the statute so broadly restricts expressive activity, the State must use the least restrictive means in achieving its goal. To the extent that the statute is designed to prevent disruption at the polling place, the statute cuts too deep because it proscribes all exit polling and interviewing, whether disruptive or not. Moreover, section 102.031(2) empowers the deputy sheriff to maintain "good order" at the polls, and section 104.0515 prohibits the deprivation of voting rights by anyone. *See Daily Herald v. Munro, supra,* at 385. And to the extent that the statutory framework is intended to reduce congestion within 150 feet of the polls, by its express terms, it allows the media and other persons within 50 feet of the polling room—so long as they do not "solicit" an "opinion." *See* Fla.Stat. § 101.121. Moreover, as we have noted already, there is no record evidence to support the contention that exit polls or reporters' interviews with willing voters have ever disrupted any polling place in the state. Indeed, Supervisor Leahy candidly conceded that he had no actual experience with exit pollsters causing any problems. If a pollster, or any other journalist or anyone else, harrasses a voter, the deputy sheriff is available at each polling place to ensure order and arrest a violator.

8. Defendant Leahy has cited to *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) in support of the contention that the state is not required to adopt the least restrictive alternative when that alternative—the prohibition of only disruptive solicitation—would be impractical. In *Heffron* the Supreme Court upheld a local rule promulgated by the Minnesota Agricultural Society for application at the State Fair, which required those who sought to sell or distribute printed materials to do so at a licensed location. The state fair rule was upheld because the High Court concluded that it served a significant governmental interest when there was no practical less-restrictive alternative.

No such showing has been made so far in the case at bar. We are left to speculate as to the use of less restrictive means to regulate disruptive activities near the polling place. Given the facts presented, and the sheer importance of the First Amendment freedoms at stake here today, we cannot say that a less restrictive alternative than the absolute prohibition against solicitation of all opinion within 150 feet would be impractical.

9. Defendants also contend that insofar as this statute is overbroad in the sense that it prohibits protected speech in traditionally public areas, we should redraft section 102.031 so as to strike the statute's application where the 150–foot zone includes traditional public areas. This we decline to do. On its face, the statute cannot be read to exclude traditionally public areas, or, for that matter, to prohibit only disruptive solicitation of voter opinion. It unequivocally bars all solicitation of opinion within 150 feet. For us to rehabilitate section 102.031 as the Defendants urge, would involve major restructuring and rewording of the statute, a task properly reposed in the legislature, not the courts. *See Hobbs v. Thompson,* 448 F.2d 456, 460 (5th Cir.1971). We add that to attempt to carve out a zone for traditional public areas without any factual data as to how many polling places would be affected or in what manner, would be altogether improvident. And to do so on a preliminary record simply cannot be justified.

10. Defendants have proffered a second interest served by the statute in question: by limiting solicitation at or near the polling place the statute tends to encourage private owners to make their property available as a polling place. What this argument really amounts to in the context of this case is that private property owners, unhappy with the nature and content of solicitation, will withdraw the use of their property, thereby causing the Supervisor of Elections to look elsewhere for a precinct polling place. We are unpersuaded by the argument. First, a fair review of this record has not established any inability on the part of the Supervisor of Elections to locate and obtain appropriate polling

places consonant with the state election law. Second, there has been no showing that any private owner has withdrawn his property as a polling place because of any exit poll or interview conducted by any reporter. Third, any suggestion that this statute even indirectly is designed and intended to limit the robust debate of controversial and noteworthy public issues, especially in a public forum, conflicts with the command of the First Amendment.

■ 11. The Plaintiffs will suffer irreparable injury if the State is not preliminarily enjoined from enforcing this statute. This Circuit has held that the loss of First Amendment rights, even for a brief period, causes irreparable harm. *Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir.1983); *see also Florida Committee for Liability Reform v. McMillan,* 682 F.Supp. 1536, 1542, *supra.* Here, the enforcement of section 102.031(3) against the solicitation of all opinion within 150 feet of the polling place would destroy the ability effectively to conduct exit polls and reporters' interviews throughout Florida on March 8, 1988. Not only would this restrict protected speech, but also would result in the loss of valuable voter information during this Presidential election year. Because of the very nature of exit polls, there are no alternative days or different methods to collect the data they gather.

12. On the other hand, based on the evidence presented at the hearing of February 26, 1988, an order enjoining the enforcement of section 102.031(3) would not cause substantial harm to the Defendants. We have been presented with no evidence suggesting that exit polling or reporters' interviews within 150 feet would disrupt any polling place in any manner, or that this conduct would cause the loss of any sites. Moreover, there exist other statutory provisions concerning polling place activities by which order and decorum may be maintained at Florida's polls and the integrity of the voting process protected. *See* Fla.Stat. §§ 101.121, 104.0515. By this preliminary injunction we do no more than enjoin the State from prohibiting pollsters from asking willing voters about their opin-

ions within 150 feet. The Plaintiffs have not challenged the restricted zone of 50 feet as measured from the polling room.

13. Finally, such an injunction would not be adverse to the public interest. Rather, we believe, that interest would be advanced as our system of government begins with "a profound national commitment to the principal that debate on public issues should be uninhibited, robust and wide open...." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

14. This Court has the discretion to issue an injunction without requiring security from the Plaintiffs. *See Florida Committee for Liability Reform v. McMillan,* 682 F.Supp. 1536, 1543, *supra; Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 569 F.2d 300, 302–03 (5th Cir.1978). The Plaintiffs shall not be required to post a bond. *Clean-up '84 v. Heinrich,* 582 F.Supp. 125, 127 (M.D.Fla.1984).

Accordingly, it is

ORDERED AND ADJUDGED:

1. That Plaintiffs' emergency motion for a preliminary injunction is hereby granted. Defendant Jim Smith, in his official capacity as Secretary of State of the State of Florida, and Defendant David Leahy, as Supervisor of Elections of Dade County, Florida, and all their officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them who receive actual notice of this notice by personal service or otherwise, including all supervisors of elections in the State of Florida, their officers, agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby prohibited and restrained until further order of this Court from:

(a) enforcing or threatening to enforce Fla.Stat. § 102.031(3) against exit polling, the conducting of voter interviews and any other journalistic activity by broadcasters, newspapers and journalists during the March 8, 1988 presidential primary; or

(b) otherwise preventing (except as provided in section 101.121) plaintiffs or any other journalists from lawfully exercising their constitutional rights to engage in speech or other expressive activity within 150 feet of any polling place within the State of Florida in the presidential primary on March 8, 1988.

2. This injunction shall not restrain those persons whose duty it is to police the polling places from the performance of their duty to protect voters or prospective voters from interference with the free exercise of their voting rights. This injunction shall not in any way affect enforcement of Fla.Stat. § 101.121.

3. This injunction is issued without requiring Plaintiffs to post security.

4. This injunction shall remain in full force and effect until the entry of a final judgment, unless it is dissolved by order of the Court upon good cause shown.