(2008)
CITIZENS FOR POLICE ACCOUNTABILITY POLITICAL COMMITTEE, and Florida State Conference of the National Association for Advancement of Colored People, Plaintiffs,
v.
Kurt S. BROWNING, in his capacity as Secretary of State of the State of Florida, and Sharon L. Harrington, in her official capacity as Supervisor of Elections, Lee County, Defendants.
Case No. 2:08-cv-635-FtM-29SPC.
United States District Court, M.D. Florida, Fort Myers Division.
August 22, 2008.

OPINION AND ORDER
JOHN E. STEELE, District Judge.
This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. #2) filed on August 11, 2008. Plaintiffs seek to enjoin the enforcement of Florida Statute § 102.031(4)(a)-(b) (2008) on the basis that it is facially unconstitutional and unconstitutional as applied to plaintiffs' petition circulation activities. Defendant Browning's Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. # 11) was filed on August 19, 2008. The Court heard oral arguments on August 21, 2008. For the reasons set forth below, the motion will be granted in part.

I.
Plaintiff Citizens for Police Accountability Political Committee ("CPA") is a political action committee registered with the Florida Secretary of State and the Lee County Supervisor of Elections. (Doc. # 1, ¶ 10.). Plaintiff Florida State Conference of the National Association for the Advancement of Colored People ("Florida NAACP") is the umbrella, organization for sixty Florida branches of the national NAACP and coordinates the activities of the NAACP branches throughout Florida, including the activities, of the Lee County, Florida, branch. (Id. at ¶ 11.) Since August 30, 2007, CPA has been circulating a petition to place an amendment of the City of Fort Myers Charter, on the ballot, in order to create a citizen oversight panel, for the Fort Myers Police Department (the "Petition"). (Id. at ¶¶ 1, 15.) The Florida NAACP joined the Petition circulation effort on April 23, 2008. (Id. at ¶ 18.) To be placed on the ballot, petitions must be "signed by ten percent of the registered electors as of the last preceding municipal general election." FLA. STAT. § 166.031(1) (2007). Plaintiffs assert that after nearly a year of circulating the Petition at polling places, recreational areas, and churches, as well as canvassing door-to-door, they and others have obtained approximately 1,700 signatures of verified voters out of the required 2,508 signatures. (Doc. # 1, ¶¶ 16, 19-22.)
Plaintiffs assert that the best method of obtaining qualified signatures is to seek voters' signatures, after they have left a polling place or early voting site. (Id. at ¶ 23.) During the Presidential Preference Primary on January 29, 2008, however, CPA petition circulators working one Lee County precinct were required to stand outside a 100-foot "No Approach Zone" created by the Florida statute now being challenged. (Id. at ¶ 16.) Plaintiffs assert that this "No Approach Zone," which in some precincts covers not only the polling place but also portions of the parking area, entry path and public sidewalks, severely impedes their. First Amendment right of access to the high concentration of civically active, registered voters found at polling places on election days and at early voting sites. (Id. at ¶ 17, 24.)
Plaintiffs plan to circulate the Petition at polling places in Lee County on August 26, 2008, and at early voting sites prior to that date, in an attempt to obtain enough signatures, to place their proposed amendment on an upcoming ballot. (Id. at ¶ 26.) Plaintiffs, seek to have a petition circulator stand near the exit of certain polling places approach voters as they exit, and attempt to obtain their signature on the Petition. (Id. at ¶ 27.) Although the subject matter of the Petition does not relate to any matter on the current ballot, the "No Approach Zone" mandated by the Florida statute would preclude this activity. (Id. at ¶ 28.)
Count One of the Complaint seeks a declaratory judgment that the Florida statute is facially unconstitutional as a content-based, substantially overbroad restriction on protected First Amendment speech and conduct. (Id. at ¶¶ 39, 40.) Count Two seeks a declaratory judgment that the Florida statute is unconstitutional as applied to plaintiffs' Petition circulation activities as a content-based, impermissible restriction on plaintiffs' First Amendment rights of speech and association, and the right to petition for grievances. (Id. at ¶¶ 47, 50, 52.) Count Three seeks preliminary and permanent injunctive relief banning the enforcement of the Florida statute against plaintiffs. (Id. at ¶ 58.)

II.
Florida Statute § 102.031 addresses, among other things, the maintenance of good order at polling places and the unlawful solicitation of voters. The statute first gives each election board the "full authority to maintain order at the polls and enforce obedience to its lawful commands during an election and the canvass of the votes." FLA. STAT. § 102.031(1) (2008). The statute then requires the Sheriff to deputize a deputy sheriff for each polling place and each early voting site, requires the deputy sheriff to be present from the time the polls or early voting sites open until the election is completed, and requires the deputy sheriff to be subject to the lawful commands of the clerk or inspectors and to maintain good order. FLA. STAT. § 102.031(2). The statute identifies the persons who may enter the polling room or polling place and early voting areas. FLA. STAT. § 102.031(3). The statute then provides, in the portion challenged by plaintiffs, as follows:
(a) No person, political committee, committee of continuous existence, or other, group, or organization may solicit voters inside the polling place or within 100 feet of the entrance to any polling place or polling room where the polling place is also a polling room, or early voting site. Before the opening of the polling place or early voting site the clerk or supervisor shall designate the no-solicitation zone and mark the boundaries.
(b) For the purpose of this subsection, the terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item. The terms "solicit" or "solicitation" shall not be construed to prohibit exit polling.
FLA. STAT. § 102.031(4)(a)-(b). The statute does not define "exit polling." The statute further requires that each supervisor of elections inform the clerk of the designated area within which soliciting is deemed to be unlawful, based on the particular characteristics of that polling place. FLA. STAT. § 102.031(4)(c). The supervisor or clerk is allowed to "take any reasonable action necessary to ensure order at the polling places," including having disruptive or unruly persons removed by law enforcement from the polling room, polling place or from the 100-foot zone surrounding the polling place. Id.
The Florida Department of State is required to create and adopt a uniform polling place procedures manual discussing, among other things, regulations governing-solicitation by individuals and groups at polling places. FLA. STAT. § 102.014(5)(a) (2008). Florida Administrative Code Rule 1S-2.034 adopted the "Polling Place Procedures Manual" (the "Manual") by the Florida Department of State, Division of Elections, the current version of which is effective August, 2008. In pertinent part, the Manual states that "[t]he only exception to the no-solicitation law applies to the media or others who are allowed to conduct exit-polling activities. They may approach voters only after voters leave the polling place." See Div. of Elections, Fla. Dep't of State, Polling Place Procedures Manual, at 4 (2008) (emphasis in original), http://election,dos.state. fl.us/publications/pdf/XXXX-XXXX/2008Voter RegisVoteGuide.pdf.

III.
In the Eleventh Circuit, the issuance of "a preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion" on each of four prerequisites. Canal Auth. of Fla. v. Callaway, 489 F.2d 567, 573 (5th Cir.1974)[1]See also McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998). The party seeking a preliminary injunction must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered absent an injunction; (3) that the injury to movant outweighs the injury the proposed injunction would cause to the opposing party; and (4) that the proposed injunction would serve the public interest. E.g., Johnston v. Tampa Sports Auth., 530 F.3d 1320, 1325 (11th Cir.2008). The burden of persuasion for each of the four, requirements is upon the movant. Siegel v. Le-Pore, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc).

IV.
Plaintiffs argue that FLA. STAT. § 102.031(4)(a)-(b) is unconstitutional both on its face and as applied to plaintiffs' exit petitioning. The current statute was amended effective July 1, 2008, and no reported case has yet addressed its constitutionality. Plaintiffs argue that the recent amendments to the statute harken back to former versions of the statute which were, found unconstitutional. (Doc. #2, pp. 2-7.) Defendants respond that Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), compels the conclusion that the Florida statute is constitutional and that plaintiffs have not satisfied any of the four requirements for a preliminary injunction. (Doc. #11.)
Some preliminary matters are not disputed by either party. First, there is no doubt that soliciting signatures for a petition to amend a city charter is a matter protected by the First Amendment. Such conduct has been appropriately described as "core political speech" in which the importance of First Amendment protection is "at its zenith." Meyer v. Grant, 486 U.S. 414, 414, 420-22, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 186-87, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). Additionally, gathering at the polls to solicit signatures is protected political association. Clean-Up '84 v. Heinrich, 759 F.2d 1511, 1513 (11th Cir.1985).
Second, there is also no doubt that the State of Florida and Lee County have compelling interests in regulating election and voting matters Each has compelling interests in protecting the right of their citizens to vote freely for candidates of their choice in an election conducted with integrity and reliability, and in protecting against voter intimidation, confusion, and election fraud. Burson, 504 U.S. at 198-99, 112 S.Ct. 1846. Thus, the U.S. Supreme Court has recognized that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Buckley, 525 U.S. at 187, 119 S.Ct. 636 (citations omitted.) See also Clean-Up '84, 759 F.2d at 1514 ("We recognize that the state has a significant interest in protecting the orderly functioning of the election process. It must ensure its voters that they may exercise their franchise without distraction, interruption, or harassment.") Additionally, the Florida Voter's Bill of Rights includes the right to "[v]ote free from coercion or intimidation by elections officers or any other person." FLA. STAT. § 101.031(2) (2006).
Third, since at least 1977, Florida has attempted to specifically prohibit solicitations of signatures, for petitions near polling places. FLA. STAT. § 104.36 (1977). Florida's statutory history, in addressing the concerns related to solicitation at a polling place, has been summarized in Florida Committee for Liability Reform v. McMillan, 682 F.Supp. 1536, 1538-39 (M.D.Fla.1988) and CBS, Inc. v. Smith, 681 F.Supp. 794, 797-98 (S.D.Fla.1988). Each version of the statute that has been challenged has been found to be unconstitutional, or has been enjoined as likely to be unconstitutional. Clean-Up '84, 759 F.2d at 1513 (invalidating 1984 version as overbroad on its face); Florida Committee, 682 F.Supp. 1536, 1538-39 (M.D.Fla. 1988) (enjoining enforcement of 1987 version as overbroad); CBS, Inc., 681 F.Supp. at 794 (enjoining enforcement of 1987 version as applied to media exit polling); Firestone v. News-Press Pub. Co., 538 So.2d 457 (Fla.1989) (invalidating statute, precluding non-voters from being within fifty feet of the polling place, as overbroad); CBS Broad., Inc. v. Cobb, 470 F.Supp.2d 1365 (S.D.Fla.2006) (enjoining enforcement of 2005 version as overbroad as applied to exit polling). Despite this history, defendants assert that "Burson reconstructed the way courts approach constitutional challenges to polling place restrictions." (Doc. # 11, p. 4.)

V.
The most hotly-contested issue is plaintiffs' substantial likelihood of success on the merits. Plaintiffs assert that they are likely to prevail on both their facial and as-applied challenges, while defendants assert that plaintiffs will not prevail on either.

A. Facial Challenge to Statute:
In Count One of their Complaint, plaintiffs argue that Florida Statute § 102.031(4)(a)-(b) (2008) violates the First Amendment on its face. A facial challenge seeks to invalidate the statute itself, and seeks to vindicate not only plaintiffs' rights but those of others who may be adversely impacted by the statute. DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1262 (11th Cir.2007). The U.S. Supreme Court has articulated two standards for evaluating such facial. First Amendment challenges. Clean-Up '84, 759 F.2d at 1513.

(1) Unconstitutional in All Applications:
Under the first test, "a plaintiff can only succeed in a facial challenge by establish[ing] that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in all of its applications." Wash. State Grange v. Wash. State Republican Party, ___ U.S. ___, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (quoting United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). "[A] facial challenge must fail where the statute has a plainly legitimate sweep." Wash. State Grange, 128 S.Ct. at 1190, quoting Washington v. Glucksberg, 521 U.S. 702, 739-40, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The Supreme Court also cautioned that "[i]n determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about `hypothetical' or `imaginary' cases." Wash. State Grange, 128 S.Ct. at 1190 (citation omitted.) In short, "[f]acial challenges are disfavored . . ." Id. at 1191.
Plaintiffs do not seem to pursue an argument under this standard. (Doc. # 2, pp. 18-21.) It is clear in light of Burson and Wash. State Grange (discussed below) that Florida Statute § 102.031(4)(a)-(b) (2008) is not categorically unconstitutional in each of its potential applications. Therefore, plaintiffs do not satisfy this standard.

(2) Overbreadth of Statute:
The second type of facial challenge in the First Amendment context concerns an impermissibly overbroad statute. Wash. State Grange, 128 S.Ct. at 1191 n. 6. "According to our First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." United States v. Williams, ___ U.S. ___, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008). Because this doctrine balances competing interests, the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep. Invalidation for overbreadth is `strong medicine' that is not to be `casually employed.'" Williams, 128 S.Ct. at 1838 (citations omitted.) "The concept of `substantial overbreadth' is not readily reduced to an exact, definition. . . . In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment, protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 800-801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).
The Court finds that plaintiffs have not shown a substantial likelihood that they can establish that Florida Statute § 102.031(4)(a)-(b) (2008) prohibits a substantial amount of protected speech either in an absolute sense or relative to the statute's plainly legitimate sweep. While plaintiffs show that a literal application of the 100-foot zone encompasses traditional public forums at some polling places, the showing has not been sufficient either in the absolute sense or relative to the statute's plainly legitimate scope. The statute requires that the supervisor of elections inform the clerk of the designated no-solicitation area "based on the particular characteristics of that polling place," FLA. STAT. § 102.031(4)(c), and requires the clerk or supervisor to designate the no-solicitation zone and mark its boundaries before the polling place or early voting site is opened. FLA. STAT. § 102.031(4)(a). Plaintiffs allege that one polling place Precinct 48, had a No Approach Zone that actually encompassed traditional public forums (Doc. #1, ¶¶ 16-17) and that this appeared to be the situation at two other polling places as well. (Declaration of Aisha Sanchez, Doc. 2-3, ¶¶ 14-15.) This does not constitute a sufficient showing that the actually designated no-solicitation zones have included traditional public forums to a substantial degree.

B. As Applied Challenge:
An as-applied challenge is available even where a facial challenge is rejected. FEC v. Wis. Right to Life, Inc., ___ U.S. ___, 127 S.Ct. 2652, 2670 n. 8, 168 L.Ed.2d 329 (2007); City Council, 466 U.S. at 803 n. 22, 104 S.Ct. 2118 ("The fact that the ordinance is capable of valid applications does not necessarily mean that it is valid as applied to these litigants.") An "as-applied" challenge seeks to vindicate only plaintiffs' own rights. DA Mortg., Inc. 486 F.3d at 1262; Jacobs v. The Florida Bar, 50 F.3d 901, 906 (11th Cir.1995).
The general substantive principles relating to election restrictions were summarized in Wash. State Grange: the States possess a broad power to prescribe the time, place and manner of holding elections for federal and state offices; this power is not absolute, and may not be exercised in a way that violates specific provisions of the U.S. Constitution, including the First Amendment; the States have the responsibility to observe the First Amendment rights of their citizens, including the freedom of political association; election regulations that impose a severe burden on associational rights are subject to strict scrutiny and are upheld only if they are narrowly tailored to serve a compelling state interest; however, if a State imposes only modest burdens, then a State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions on election procedures. Wash. State Grange, 128 S.Ct. at 1191-92 (quotations and citations omitted).
As relevant to this case, FLA. STAT. § 102.031(4)(a)-(b) provides that "[n]o person... may solicit voters ... within 100 feet of the entrance to any polling place... or early voting site.... `[S]olicit' or `solicitation' shall include, but not be limited to, ... seeking or attempting to seek a signature on any petition; ... `solicit', or `solicitation' shall not be construed to prohibit exit polling." Defendants conceded at oral argument that the statute is content-based, and therefore that strict or exacting scrutiny applies. The strict scrutiny standard defendants advocate is that set forth in Burson.
At issue in Burson was a Tennessee statute prohibiting the solicitation of votes for or against any person, political party or position, and prohibiting displays or distributions of campaign materials within 100 feet of the entrance to a polling place. Burson, 504 U.S. at 193-4, 112 S.Ct. 1846. A plurality of the Supreme Court found that "[a]s a facially content-based restriction on political speech in a public forum [the Tennessee statute] must be subjected to exacting scrutiny: The State must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Id. at 198, 112 S.Ct. 1846 (quotations omitted). The Supreme Court noted that to survive strict scrutiny, "a State must do more than assert a compelling state interest-it must demonstrate that its law is necessary to serve the asserted interest." Id. at 199, 112 S.Ct. 1846. The Court "readily acknowledged" that a law rarely survives the exacting standards of strict scrutiny analysis, but found that "an examination of the evolution of election reform . . . demonstrates the necessity of restricted areas in or around polling places." Id. at 200, 112 S.Ct. 1846. The Court found that a history of pervasive and systematic abuses of the electoral system led all fifty States to settle on the same solution: "a secret ballot secured in part by a restricted zone around the voting compartments. We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." Id. at 206, 112 S.Ct. 1846.
In reaching this conclusion, the Court rejected three arguments. First, the Court rejected the argument that the statute was overinclusive because the State could secure the same compelling interests with statutes making it a misdemeanor to interfere with an election or to use violence or intimidation to prevent voting. Id. (quotations omitted). Second, the Court rejected the argument that the statute was underinclusive because it does not restrict other types of speech, including exit polling. Id. at 207, 112 S.Ct. 1846 (quotations omitted). The Court stated: "We agree that distinguishing among types of speech requires that the statute be subjected to strict scrutiny. We do not, however, agree that the failure to regulate all speech renders the statute fatally underinclusive." Id. The Court found that while there was ample historical evidence that political candidates had used campaign workers to commit voter intimidation and electoral fraud, there was no historical evidence that other forms of solicitation or exit polling had been used to commit such electoral abuses. "States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist." Id. Third, the Court rejected the argument that there was no link between ballot secrecy and some restricted zone surround the voting area. Id. at 207-08, 112 S.Ct. 1846. The Court held that "some restricted zone around the voting area is necessary to secure the State's compelling interest." Id. at 208, 112 S.Ct. 1846 (emphasis in original).
The Court then discussed the "real question" of "how large a restricted zone is permissible or sufficiently tailored." Id. (emphasis in original). The Court concluded that an empirical demonstration of the objective effects of the statute on voting was unnecessary ("Elections vary from year to year, and place to place"), and that proof that the 100-foot boundary was perfectly tailored to deal with the State's interests was not necessary so long as the statute was reasonable and did not significantly impinge on constitutionally protected rights. Id. at 209, 112 S.Ct. 1846.[2] The Court concluded that it did "not think that the minor geographic limitation prescribed by [the statute] constitute[d] such a significant impingement. Thus, [it] simply d[id], not view the question whether the 100-foot boundary line could be somewhat tighter as a question of `constitutional dimension.'" Id. at 210, 112 S.Ct. 1846. "The State of Tennessee has decided that these last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible. We do not find that this is an unconstitutional choice." Id.
Thus, under Burson, the State must show that the statute is (1) necessary (2) to serve a compelling state interest and (3) that it is narrowly drawn or sufficiently tailored to achieve that end. As discussed previously, there is no dispute that Florida Statute § 102.031(4)(a)-(b) (2008) serves compelling state interests. The difficulty in this case involves whether the restricted area is "necessary" and narrowly drawn in relation to plaintiffs' specific activities. In the as-applied context of this case, the Court finds that the statutory restriction is neither necessary nor narrowly drawn as applied to plaintiffs' exit petitioning activity.
Burson's determination that a restricted area around polling places could be necessary was based upon an extensive review of historical experience with political candidates, and their abuse and attempted abuse of the electoral process. The Tennessee statute at issue related directly to such abuse, prohibiting the solicitation of "votes" (not "voters" as in the Florida statute) and the display and distribution of campaign materials. The ample historical evidence clearly established the necessity for such a restricted zone as to such conduct. In contrast, Burson found no historical evidence that solicitations by others or exit polling had been used to commit comparable electoral abuses. 504 U.S. at 206, 112 S.Ct. 1846. The evidence submitted by the parties in this case also fails to establish electoral abuses perpetrated by other exit solicitors or exit polling. Therefore, at this stage of the proceedings, there has not been a sufficient showing that the restriction on exit petitioning is necessary.
In this case, the narrowly-drawn component of strict scrutiny review relates not to the 100-foot distance but to the types of activities precluded within that zone. Exit polling, left undefined in the Florida statute, is permitted, while other exit solicitation, including the solicitation of signatures on petitions, are prohibited. Even assuming that an exit, solicitation qualifies for the "modified burden of proof" requirement of Burson because it is considered an "activity [which] physically interferes with electors attempting, to cast their ballots," Burson, 504 U.S. at 209 n. 11, 112 S.Ct. 1846, the statute must still be reasonable and must not significantly impinge on constitutionally protected rights. The record at this stage of the proceedings does not satisfy these requirements as they relate to plaintiffs' proposed activities. Plaintiffs propose to, in a peaceful, orderly and nondisruptive manner, (1) solicit signatures (2) for a petition required by statute to place an amendment of the Fort Myers City Charter on a future ballot (3) from voters at polling places and early voting sites (4) after the voters have voted (5) during the August 26, 2008 election and its early voting period, during which the subject matter of the petition is not related to any matter upon which the voters are deciding. Under these specific circumstances, the ban on soliciting signatures is not narrowly drawn or sufficiently tailored to satisfy the First Amendment.

VI.
The remaining three requirements for a preliminary injunction require relatively less discussion, and each will be briefly addressed in turn.

A. Substantial Threat of Irreparable Injury if Relief Denied:
Defendants assert that plaintiffs' purported injury can be simply quantified in terms of the additional money, time and effort to be expended by plaintiffs, while pursuing the remaining signatures for the Petition. (Doc. # 11, pp. 18-19.) Defendants claim that plaintiffs "could eliminate any purported harm by expending the additional increment of time and effort to collect sufficient signatures outside of the protected zone, just as numerous other sponsors of successful Florida initiative petitions (both local and statewide) have done."[3]
Plaintiffs assert that irreparable harm will result in the absence of an injunction; namely, that no amount of monetary damages would suffice to compensate plaintiffs for "the lost opportunity to circulate the [P]etition at Lee County polling places on the day of an election and at early voting sites," (Doc. # 2, p. 22), and that "because of the `intangible nature' of the harm the chilling of speech inflicts, it cannot be compensated for by money damages." Id. (citing KH Outdoor, LLC v. Trussville, 458 F.3d 1261, 1272 (11th Cir.2006).).
The Court finds that plaintiffs have shown that they will suffer irreparable injury if a preliminary injunction is denied because the loss of First Amendment rights, even for a short period, causes irreparable harm. "[I]t is well established [by the Supreme Court] that `[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" E.g., KH Outdoor, 458 F.3d at 1271-2 (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)); Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir.1983). "To the extent that an infringement of First Amendment rights is shown, some federal courts have held that irreparable injury justifying preliminary injunctive relief is presumed." Cate, 707 F.2d at 1189 n. 10 (citation omitted). "One reason for such stringent protection of First Amendment rights certainly is the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." Id. at 1189 (citation omitted). Restricting plaintiffs' access to seek petition signatures will work an irreparable harm on plaintiffs' exercise of their rights to petition the government for redress of grievances.

B. Balancing Injury to Parties:
Plaintiffs assert that they would suffer significantly greater harms under the statute's restrictions than defendants would suffer should the injunction be granted. Plaintiffs claim that polling places provide the highest concentration of registered voters, who are precisely the signatories required under Florida statute in order to place the Petition on the ballot. (Doc. # 2, p. 22.) Plaintiffs further argue that "door-to-door canvassing and shoppingmall [sic] solicitation are poor and impractical alternatives for purposes of collecting large numbers of signatures for registered voters," and that the farther plaintiffs get from the polling place exit, the less likely they are to interact with a voter. (Id. (citing Committee for Sandy Springs, Inc. v. Cleland, 708 F.Supp. 1289, 1291 (N.D.Ga.1988); CBS, Inc., 681 F.Supp. 794, 799-800 (S.D.Fla.1988)).)
Defendants claim that plaintiffs' injury is "hardly substantial" and that on balance, the imposition of a preliminary injunction would "not be a measured response to [p]laintiffs' claims that their signature gathering would be more efficient closer to the polling place door." (Doc. # 11, p. 19.) As discussed above, it is not clear from the record in this case that the issuance of a preliminary injunction will substantially harm defendants, or that denial of plaintiffs' requested relief is necessary to protect defendants' legitimate interests. Furthermore, as plaintiffs indicate, "a number of readily available means, short of an outright ban on solicitation, can be employed to protect the integrity of the election process." (Doc. # 2, p. 24 (quoting Florida Committee, 682 F.Supp. at 1543).) Thus, the Court finds that plaintiffs have shown that they will suffer relatively more harm from the denial of a preliminary injunction than defendants would suffer should relief be granted.

C. Public Interest:
Defendants assert, legitimately, that Florida has an interest in "protecting voters from harassment and intimidation at their polling places ... [and in] protecting] the orderly administration of elections and the election process." (Doc. # 11, p. 20.) Defendants further argue that the issuance of a preliminary injunction runs counter to this public interest. Defendants claim that "Florida's interest in maintaining a limited protected zone around polling places is substantial," and that plaintiffs' "purported needs cannot justify the invalidation of Florida's critical protected zone around polling places." (Doc. #11, p. 20.) Plaintiffs disagree, stating that "[b]ecause freedom of speech is a cherished right in American society, those activities that promote the exercise of this fundamental right are clearly in the public interest." (Doc. # 2, p. 24.)
The Court finds that the public interest would be furthered by granting a preliminary injunction to enjoin enforcement of the statute and to allow plaintiffs' requested form of exit petition circulation, without unduly burdening the State's interest in preventing voter intimidation or erosion of integrity in the electoral process. As in Florida Committee, impeding plaintiffs from asking their fellow citizens to join them in proposing an amendment defeats the public interest in robust debate on public issues. 682 F.Supp. at 1543. See also, Clean-Up '84 v. Heinrich, 582 F.Supp. 125, 127 (M.D.Fla.1984) ("All citizens have, an interest in a robust debate on public issues."). Further, the Court agrees with plaintiffs' argument that "not only will a preliminary injunction serve [p]laintiffs' interest in exercising their rights, it will also serve the interests of the citizens and registered voters of the City of Fort Myers in receiving communications of the sort proffered by [plaintiffs]". (Doc. # 2, p. 25 (citing University Books & Videos, Inc. v. Metropolitan Dade County, 33 F.Supp.2d 1364, 1374 n. 11 (S.D.Fla. 1999)).)
Accordingly, it is now
ORDERED:
Plaintiffs' Motion for Preliminary Injunction (Doc. # 2) is GRANTED in part. A preliminary injunction will issue separately.
NOTES
[1] In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close, of business on September 30, 1981.
[2] The Court noted that this "modified `burden of proof'" applied "only when the First Amendment right threatens to interfere with the act of voting itself, i.e., cases involving voter confusion from overcrowded ballots, like Munro [v. Socialist Workers Party, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)], or cases such as this one, in which the challenged activity physically interferes with electors attempting to cast their ballots." Burson, 504 U.S. at 209 n. 11, 112 S.Ct. 1846.
[3] Defendants, claim that Elrod is inapplicable because Florida's "No Approach Zone" "does not prevent speech altogether-it is a `minor geographic limitation' that constitutes no `significant impingement' of First Amendment rights." (Doc. #11, p. 19 n. 15 (quoting Burson, 504 U.S. at 210, 112 S.Ct. 1846).) The language that defendants reference, however, refers to the Supreme Court's discussion of the radius of the Burson statute's protected zone (whether a 100-foot zone is narrowly tailored), rather than the Supreme Court's substantive discussion as to the protected zone's constitutionality overall.