981 A.2d 64

IN RE ATTORNEY GENERAL'S "DIRECTIVE ON EXIT POLLING:
MEDIA AND NON-PARTISAN PUBLIC INTEREST GROUPS,"
ISSUED JULY 18, 2007 (A-47-08).

Argued February 17, 2009—Decided September 30, 2009.

*Frank L. Corrado* argued the cause for appellant American Civil Liberties Union of New Jersey (*Barry, Corrado, Grassi & Gibson* and *Edward L. Barocas,* Director of American Civil Liberties Union of New Jersey, attorneys; *Mr. Corrado* and *Mr. Barocas,* on the briefs).

*Larry R. Etzweiler,* Senior Deputy Attorney General, argued the cause for respondent Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney; *Nancy Kaplen* and *Lewis A. Scheindlin,* Assistant Attorneys General, of counsel; *Mr. Etzweiler* and *Jason S. Postelnik,* Deputy Attorney General, on the briefs).

*Flavio L. Komuves,* Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate of New Jersey (*Ronald K. Chen,* Public Advocate, attorney; *Mr. Komuves, Brian Weeks,* Deputy Public Advocate, and *Fenix A. Manning–Bowman,* Assistant Deputy Public Advocate, on the brief).

288

Justice ALBIN delivered the opinion of the Court.

The American Civil Liberties Union of New Jersey (ACLU) challenges both an Attorney General directive, which requires those conducting exit polling to register with election officials two weeks before an election, and the Attorney General's denial of the ACLU's request to distribute so-called "voting-rights cards" within 100 feet of a polling place. In our view, the true issue is whether *all* expressive activities—electioneering and non-electioneering—are banned within 100 feet of a polling place under New Jersey's election laws and, if so, whether such a ban, as it applies to exit polling and the distribution of voting-rights cards, conforms to the First Amendment of the United States Constitution.

Our review of the clear language of the applicable election-law statutes, and the history that animated those statutes, leads us to conclude that the Legislature intended that voters would have a 100-foot free, unobstructed passage to the polling place, without interference from any person, whether that person is conducting exit polling or handing out voting-rights cards. The ban applies to all expressive activities within that zone, however seemingly laudable or ignoble. We also hold that those election laws are reasonable time, place, and manner restrictions under the First Amendment intended to secure and enhance another vital constitutional right—the right to vote.

We disagree with the Attorney General's analysis that the First Amendment requires an exception to be carved out of our election-law statutes for exit polling, and *only* exit polling, in the 100-foot exclusionary zone. That analysis placed the Attorney General in the role of a self-appointed government censor, choosing one form of expressive activity—to the exclusion of all others—within the prohibited zone.

I.

In 1972, the Attorney General for the first time rendered an opinion concerning the legality of exit polling within 100 feet of a polling place on Election Day. The Attorney General determined

that such polling activities would violate New Jersey's election laws, *N.J.S.A.* 19:34-6, -7, and -15. The 1972 Opinion declared that our election laws are intended to provide voters with "complete freedom of movement entering and leaving the polls" and prohibit any person, including a news reporter, from "solicit[ing] any voter within one hundred feet of the entrance to the polling place." Indeed, the Attorney General considered "[t]he mere solicitation of a voter's views through exit polling . . . to constitute an impermissible obstruction prohibited by *N.J.S.A.* 19:34-6, -7 and -15."

In 1988, the Attorney General reversed course. That year, the "major television networks" inquired whether they could conduct exit polling for the presidential primaries within the 100–foot exclusionary zone. The Attorney General issued a letter advising the Secretary of State that the news media possessed a First Amendment right to conduct exit polling within 100 feet of a polling place "in light of recent judicial decisions." (Citing *Daily Herald Co. v. Munro*, 838 *F.*2d 380 (9th Cir.1988); *CBS Inc. v. Smith*, 681 *F.Supp.* 794 (S.D.Fla.1988)). The Attorney General's 1988 letter did not address the right of non-media persons and entities, including public interest groups, to conduct exit polling within the prohibited zone.

In a letter dated August 31, 2006, the Attorney General advised county election officials that, "beginning with the November 2006 General election," non-partisan public interest groups would be permitted to conduct exit polling and to distribute voting-rights cards within 100 feet of the outside entrance of a polling place. In that same letter, the Attorney General stated that a directive would be issued setting forth detailed guidelines for exit polling and pamphleting by non-partisan public interest groups and welcomed input from those county officials "in developing the directive."

In September 2006, a draft directive was circulated, and the Attorney General received a wide array of comments from public and private individuals and groups. The comments included

expressions of concern from election officials about implementing a policy that permitted both exit polling and pamphleting within the 100–foot zone. For example, the New Jersey Association of Election Officials indicated that it had "serious concerns" that permitting "additional people access [within the exclusionary zone would] create a congested and unsafe environment for ingress and egress to polling places, including schools, firehouses, senior buildings and other public places." The Association also expressed alarm that "the smooth and efficient election process will be sacrificed to hordes of special interests cluttering the polling areas." Camden County election officials also voiced concern that permitting non-partisan public interest groups to conduct exit polling and hand out pamphlets within 100 feet of a polling place would "wreak havoc for Boards of Elections." Those officials believed that it would be difficult to determine whether a group was, in fact, non-partisan and acting in the public interest and "impossible" to ensure that exit pollsters did not engage in prohibited activity around the entrances to polling sites.

The July 2007 Attorney General's Directive issued to county election officials permits exit polling by both media and non-partisan entities within 100 feet of a polling place, under specified terms, but prohibits the distribution of any "materials" to voters within the 100–foot zone.[1] The Directive provides:

1. At least two weeks before an election, a representative of a media outlet or a non-partisan public interest group [seeking to conduct exit polling] must submit a letter to the applicable county board of election, identifying polling place locations where the exit polling is to be conducted.

2. The county board of election must provide an authorization letter for exit polling to the media and/or non-partisan interest group. This letter is to include the procedures that are set forth in this directive.

---

[1] The Attorney General issued the 2007 Directive in her dual capacity as the State's chief law enforcement officer and chief election official. See L. 2004, c. 88, § 11 (designating Attorney General "chief State election official"). Effective April 1, 2008, the Secretary of State replaced the Attorney General as the State's chief election official. L. 2007, c. 254, §§ 2–3 (amending N.J.S.A. 19:31–6a).

3. Any person conducting an exit poll must display credentials, provided by the applicable county board of election, that identify his or her name and the organization that is conducting the exit polling.

4. At all times, exit polling must be conducted in a way that does not obstruct any voter or other authorized individual who is entering or leaving the polling place.

5. Exit polling must be conducted only when a voter is exiting the polling place, and the voter's participation is strictly voluntary.

6. Exit polling can be conducted within the 100 foot zone from the outside entrance to the polling place.

7. Exit polling cannot be conducted inside the polling place, including the passageway to the polling room and the room itself.

8. There can be no electioneering on behalf of any candidate, political party or group, or referendum within the 100 foot zone.

9. No campaign paraphernalia, signs or other insignia can be displayed by any person conducting an exit poll within the 100 foot zone.

10. Any person conducting an exit poll within the 100 foot zone must comply with any directive from an election official or authorized representative to assure the orderly conduct of the election.

11. Persons conducting an exit poll cannot poll, assist, or offer materials to voters entering the polling place.

Seeking clarification of the 2007 Directive, the ACLU wrote to the Attorney General asking (1) whether "exit polling" included questions about "voters' experiences at the polls"; (2) whether "exit polling *activity*" included the distribution of voting-rights cards to exiting voters; and (3) whether "individuals or organizations who engage in neither exit polling nor electioneering, such as a peace organization handing out leaflets about an upcoming peace vigil or a parent-teacher association handing out information about an upcoming bake sale" could engage in expressive activity within 100 feet of a polling place.

The Attorney General responded that within the 100–foot zone (1) "[q]uestioning voters regarding his or her voting experience . . . would be a legitimate part of exit polling"; (2) "the distribution of materials, such as 'Know–Your–Rights' pamphlets, would not be encompassed within 'exit polling activity,' " and therefore would be prohibited; and (3) the only persons permitted within the zone would be "properly credentialed exit pollsters."

On October 1, 2007, the ACLU filed a Notice of Appeal with the Appellate Division challenging the Attorney General's 2007 Directive. *See R.* 2:2–3(a) ("[A]ppeals may be taken to the Appellate Division as of right ... (2) to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer....").

## II.

The Appellate Division upheld the Attorney General's 2007 Directive that mandates media and non-partisan public interest groups to notify the appropriate county board of election two weeks in advance of an election of their intent to conduct exit polling within 100 feet of a polling place.[2] *In re Attorney Gen.'s "Directive on Exit Polling: Media and Non–Partisan Public Interest Groups"*, 402 *N.J.Super.* 118, 138, 952 *A.2d* 1127 (App. Div.2008). The appellate panel also upheld the Attorney General's authority to bar the handing out of voting-rights cards within the 100–foot exclusionary zone. *Ibid.*

The panel determined that the 2007 Directive provides only that a party seeking to conduct exit polling give notice and receive authorization—not approval—from a county election board so that the board can identify those individuals permitted to be within the 100–foot zone. *Id.* at 137–38, 952 *A.2d* 1127. Without the Directive's requirements, the panel observed, "it would be impossible to monitor which individuals could properly approach a voter within 100 feet of the entrance to the polling place." *Id.* at 138, 952 *A.2d* 1127. The panel rejected the ACLU's contention that, under the Directive, a county board was empowered "to deny [the ACLU] the opportunity to conduct its exit polling." *Ibid.*

---

2 The Public Advocate of New Jersey filed an amicus curiae brief in support of the position taken by the ACLU. *See In re Attorney Gen.'s "Directive on Exit Polling: Media and Non–Partisan Public Interest Groups"*, 402 *N.J.Super.* 118, 125, 952 *A.2d* 1127 (App.Div.2008).

The panel also agreed with the Attorney General that the applicable election-law statute, *N.J.S.A.* 19:34–15, barred the distribution or display of any material, however innocuous, "to a voter within 100 feet of the outside entrance of a polling place." *Id.* at 129, 952 *A.2d* 1127. Although it did not "doubt the sincerity or integrity of [the] ACLU['s]" desire to educate voters on their legal rights, the panel nevertheless feared that "less scrupulous individuals might attempt to secretly place within an otherwise innocuous pamphlet material urging a vote for or against a particular candidate." *Id.* at 131, 952 *A.2d* 1127. Allowing the circulation of material within the 100–foot exclusionary zone, the panel believed, "would place an intolerable burden on local election workers to determine whether the material is, in fact, non-partisan and non-electioneering." *Id.* at 132, 952 *A.2d* 1127.

The panel concluded that the Attorney General's prohibition on the distribution of voting-rights cards within 100 feet of polling places and the notification and authorization requirements imposed on pollsters were not undue infringements on the constitutional right to expressive activity. *Id.* at 129–32, 137–38, 952 *A.2d* 1127. According to the panel, the Legislature acted within its constitutionally permissible sphere by permitting this State's "voters at least a brief sanctuary from solicitation and importuning as they approach a polling place." *Id.* at 132, 952 *A.2d* 1127. Last, the panel found that the issuance of the Directive did not fall within the ambit of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –25, and therefore the Attorney General did not have to comply with the dictates of the Act. *Id.* at 137, 952 *A.2d* 1127.

We granted the ACLU's petition for certification. 196 *N.J.* 599, 960 *A.2d* 395 (2008). We also granted the Public Advocate of New Jersey's motion to participate as amicus curiae.

### III.

The ACLU urges this Court to reverse the Appellate Division and invalidate the Attorney General's 2007 Directive. The ACLU contends that the 2007 Directive constitutes a prior restraint in

violation of the First Amendment because, before conducting exit polling, media and non-partisan public interest groups are required to give two-weeks advance notice to and receive authorization from a county election board. The ACLU asserts that the Attorney General did not articulate a substantial justification for the notification and authorization requirements, other than administrative convenience, to overcome the bar on prior restraints of speech. The ACLU reasons that "even a ministerial advance registration requirement can substantially, and impermissibly, burden protected expression" and that the two-week-advance-notice mandate prevents the media and non-partisan groups from "reacting to election-day complaints about problems at a particular polling place."

The ACLU also submits that "because the [2007 Directive] carves out a 'First Amendment exemption' for exit polling from what the [S]tate claims is the [election-law] statute's absolute ban on expressive activity near the polls," the State converted a content-neutral statute into a content-based one. Now, according to the ACLU, because the election-law statutes prohibit all forms of speech, other than exit polling, within 100 feet of a polling place, the State must justify why the non-obstructive distribution of non-partisan "voters' rights cards poses any real dangers to the voting process." The ACLU maintains that the Attorney General's content-based Directive cannot survive strict constitutional scrutiny.[3]

Amicus curiae, the New Jersey Public Advocate, joins the ACLU in calling for the invalidation of the Attorney General's 2007 Directive. He claims that the First Amendment requires that the Attorney General show that the Directive's ban on distributing non-partisan voting-rights cards is narrowly drawn to serve a compelling state interest. He insists that although the

---

[3] The ACLU also argues that the Appellate Division erred in ruling that the Attorney General did not have to follow the dictates of the Administrative Procedure Act before promulgating the 2007 Directive. Because of the disposition in this case, we need not address that issue.

"State has a compelling interest in protecting voters from intimidation, fraud, confusion, coercion, and undue influence," the Attorney General has failed to "prove that a complete ban on the distribution of nonpartisan voter education information near polling places is 'necessary' to serve those interests." The Public Advocate declares that the Directive is unconstitutional because "imagined or conceivable misconduct" is not a sufficient basis to restrict expressive rights.

The Attorney General urges this Court to affirm the Appellate Division and uphold the 2007 Directive. The Attorney General argues that the two-week-exit-polling-notification requirement does not run afoul of the First Amendment because the purpose of the registration is " 'not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of [forum] facilities, [and] prevent uses that are . . . unlawful, or impermissible.' " (Quoting *Thomas v. Chicago Park Dist.*, 534 *U.S.* 316, 322, 122 *S.Ct.* 775, 780, 151 *L.Ed.*2d 783, 791 (2002)). The Attorney General insists that requiring exit pollsters to give two-weeks advance notice is a reasoned response to the needs of election officers, who must monitor and confirm whether only credentialed individuals are conducting polling within the 100–foot exclusionary zone. She emphasizes that the issuance of exit-polling "credentials is [a] ministerial" and not a discretionary task, and therefore the State is not engaged in a prior restraint of speech.

The Attorney General also maintains that *N.J.S.A.* 19:34–15's ban on the display or distribution of circulars and printed material within 100 feet of a polling place is not limited to electioneering but applies to all causes, and therefore the dissemination of voting-rights cards within the exclusionary zone is forbidden. The 2007 Directive, according to the Attorney General, is a constitutionally proper content-neutral time, place, and manner regulation that bans all expressive activity within a 100–foot distance from the polls. The Attorney General submits that the Directive's distinction between exit polling and all other expressive activity "does

not render the regulation content-discriminatory within the meaning of First Amendment jurisprudence." It is not that "the Legislature's intent [is] to discriminate against content other than exit polling," reasons the Attorney General, but rather that the First Amendment "guarantee[s] news media and other groups the right to conduct exit-polling activities." The Attorney General believes that her 2007 Directive is " 'narrowly tailored to serve a significant governmental interest, and leave[s] ample alternatives for communication.' " (Quoting *Burson v. Freeman*, 504 *U.S.* 191, 197, 112 *S.Ct.* 1846, 1850, 119 *L.Ed.*2d 5, 13 (1992) (plurality opinion)).

## IV.

Our first task is to determine whether New Jersey's election-law statutes bar all expressive activity within 100 feet of a polling place on Election Day. If we find that the statutory scheme bans all such activity within the exclusionary zone, we next must assess whether the freedom of speech and press guarantees of the First Amendment render our election laws unconstitutional unless we read certain exceptions into those laws. The Attorney General already has carved out of the statute a constitutional exception for exit polling. The ACLU essentially claims that the exception for exit polling has converted a content-neutral election law into a content-based one, now requiring a further constitutional exception for the distribution of voting-rights cards within the prohibited zone.

### A.

We begin, as we must, with the plain language of the statutes at issue. *See State v. Gelman*, 195 *N.J.* 475, 482, 950 *A.*2d 879 (2008). When the words of the statute are clear, our role is to enforce the statute as written. *See DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). Only if the statutory words are ambiguous do we look for extrinsic evidence of the Legislature's intent. *See id.* at 492–93, 874 *A.*2d 1039 ("[I]f there is ambiguity

in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction." (citation and internal quotation marks omitted)).

██ Our election-law statutes, *N.J.S.A.* 19:34–6, –7, and –15, when read together and when their words are given their plain meaning, manifest a comprehensive scheme to bar *all* expressive activity within 100 feet of a polling place on Election Day. *See DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039 ("We ... read [statutes] in context with related provisions so as to give sense to the legislation as a whole." (citation omitted)). The first of the three applicable election-law statutes is *N.J.S.A.* 19:34–6(a), which provides:

> If a person shall on election day tamper, deface or interfere with any polling booth or *obstruct the entrance to any polling place, or obstruct or interfere with any voter, or loiter in or near the polling place,* or, with the purpose to obstruct or interfere with any voter or to unduly delay other voters from voting, spend an inordinate amount of time in the polling booth, or do any *electioneering within any polling place or within one hundred feet thereof,* he shall be guilty of a crime of the third degree.
>
> [ (Emphasis added). ]

That statute clearly prohibits not only electioneering within a 100–foot exclusionary zone, but also *obstructing* or *interfering* with any voter, or *loitering* near the polling place.

*N.J.S.A.* 19:34–6(a) is not limited to barring just electioneering activity near a polling site, and is reinforced by a second statute, *N.J.S.A.* 19:34–7, titled "Violation of ballot regulations." *N.J.S.A.* 19:34–7 provides that no "person [shall] within the polling place or within a hundred feet thereof, loiter, electioneer, or solicit any voter." Here, again, the Legislature distinguished between *electioneering* and *loitering* and *soliciting* a voter.

██ We hardly need say that, as commonly understood, the words obstructing, soliciting, and interfering with a voter, as well as loitering, encompass activities far broader than electioneering. Had the Legislature intended to bar only electioneering activities, the other statutory words would have been unnecessary. We

must presume that every word in a statute has meaning and is not mere surplusage, and therefore we must give those words effect and not render them a nullity. *See DKM Residential Props. Corp. v. Twp. of Montgomery*, 182 *N.J.* 296, 307, 865 *A.*2d 649 (2005).

*N.J.S.A.* 19:34–6 and –7, standing alone, evince a legislative intent to provide voters on Election Day with unobstructed and free passage as they walk the last 100 feet into a polling place. The 100–foot obstruction-free zone leading into a polling site does not allow for any activity that would interfere with a voter's passage, including exit polling, handing out voting-rights cards, haranguing voters on important issues of the day, or making commercial sales pitches.

The third statute, *N.J.S.A.* 19:34–15, makes it a disorderly persons offense to "distribute or display any circular or printed matter or offer any suggestion or solicit any support for any candidate, party or public question within the polling place or room or within a distance of one hundred feet of the outside entrance to such polling place or room." Given the wording of *N.J.S.A.* 19:34–15, both sides have reasonable arguments whether the prohibition on the distribution of materials applies only to electioneering. However, when viewed together with *N.J.S.A.* 19:34–6 and –7, we believe that the better reading of *N.J.S.A.* 19:34–15 is that the ban on circulars and printed matters, within the 100–foot exclusionary zone, must equally apply to expressive activities other than electioneering.

We read the three statutes in harmony, not in conflict, with one another. *See St. Peter's Univ. Hosp. v. Lacy*, 185 *N.J.* 1, 14, 878 *A.*2d 829 (2005) ("[I]t is our obligation to make every effort to harmonize separate statutes, even if they are in apparent conflict, insofar as we are able to do so." (citation and internal quotation marks omitted)). If under our election laws one cannot speak to a voter entering a polling site—that is, interfere with or solicit that voter—it is unlikely that the Legislature intended to allow inter-ference or solicitation through the distribution of printed materi-

als. Moreover, handing out materials would require standing for some period of time outside the polling precinct; in other words, the person distributing the materials, arguably, would be loitering, an act prohibited under *N.J.S.A.* 19:34–6 and –7.[4]

Thus, all three statutes constitute a comprehensive ban on activity that might obstruct or interfere with a voter near a polling place.[5] It bears mentioning again that the Attorney General in 1972 issued an opinion that reached the same unremarkable conclusion. The Attorney General then viewed our election laws as "embodying a legislative intent that voters have complete freedom of movement entering and leaving the polls and that no one, news reporter or otherwise, for whatever purpose, be allowed to solicit any voter within one hundred feet of the entrance to the polling place."

## B.

Even if the words of the election-law statutes were shrouded in ambiguity, the historical record buttresses the view that the Legislature intended a total ban on activity near a polling place on Election Day. Our modern statutory scheme barring activity in the area outside polling sites has its origins in an 1890 legislative enactment addressing voter intimidation. *See generally L.* 1890, *c.* 231. New Jersey, like many other states, experienced corrupt-

---

[4] A fourth statute, *N.J.S.A.* 19:15–8(a), which is not at issue in this case, proscribes the presence of anyone in the polling place or room other than voters and certain select persons.

[5] New Jersey's statutory ban on *all* expressive activity within 100 feet of a polling place is similar to provisions in election codes of other states. *See, e.g., Ariz.Rev.Stat. Ann.* § 16-515(B) ("No person shall be allowed to remain inside [a seventy-five-foot exclusionary zone] while the polls are open, except for the purpose of voting... "); *Iowa Code* § 39A.4(1)(a)(1) (prohibiting, "within three hundred feet of an outside door" of polling place, "[l]oitering, congregating, electioneering, posting signs, treating voters, or soliciting votes"), *Okla. Stat.* tit. 26, §§ 7–108, 7–108.3 (providing that no "person[ ], except election officials and other persons authorized by law, be allowed within fifty (50) feet of any ballot box while an election is in progress," with no exception for exit pollsters).

ing and corrosive practices outside polling precincts that undermined the right to vote. *See Burson v. Freeman,* 504 *U.S.* 191, 200–02, 112 *S.Ct.* 1846, 1852–53, 119 *L.Ed.2d* 5, 15–16 (1992) (plurality opinion). Those crude practices included party workers intimidating some voters from entering polling sites and influencing others in the casting of their ballots. *See, e.g.,* Richard P. McCormick, *The History of Voting in New Jersey* 180 (1953) (describing area outside polling places as "swarm[ing] with party workers" and "scene[s] of tumult and confusion").

For example, following the 1889 General elections, the State Senate's Committee on Elections documented "false registrations, widespread repeating, colonizing, intimidation, miscounting, and illegal ballots." Peter H. Argersinger, *New Perspectives on Election Fraud in the Gilded Age,* 100 *Pol. Sci. Q.* 669, 683 (1985–1986) (citing *Journal of the Forty–Sixth Senate of the State of New Jersey* 720–51 (Trenton, N.J., Sharp Printing Co. 1890) [hereinafter *S. Journal* ] ). The Senate Committee found:

> Voting is so conducted that it is disagreeable for respectable people to vote, and electioneering for any ticket not approved by the rough crowd that surrounds the polls is made not only disagreeable, but difficult and dangerous. Watchers are assaulted or hustled about or drawn into quarrels, their tickets destroyed, and their tally books snatched away. Honest voters who are well known find hindrances to their voting, and are surprised by being challenged and delayed at the polls, while loafers whom nobody ever before saw there are quickly recognized and their votes deposited in the box before time enough has elapsed to find their names on the registry.

[*S. Journal, supra,* at 732–33.]

The 1889 elections represented "a case of election crimes unprecedented in the annals of the State." *S. Journal, supra,* at 721, 734.

In response to those gross improprieties outside polling precincts, in 1890, Governor Robert S. Green called on the Legislature to adopt "ballot reform" in order to secure every citizen's right to vote. *Third Annual Message of His Excellency Robert S. Green Governor of New Jersey, to the Legislature—Session of 1890,* at 12 (Trenton, N.J., MacCrellish & Quigley 1890). Specifically, Governor Green urged the adoption of legislation regulating the area in and around polling sites:

All seem agreed on the plan that the voter, while preparing his ballot, should be provided with the means of doing the same alone, and the prevention of solicitation within a certain distance of the polls. These provisions give the voter an opportunity to prepare, arrange, or select just such ballot as he desires to vote, without interference from any one, and protects him, so far as any mechanical or physical arrangements are possible, from the oversight which has been the attendant aid of intimidation or corruption.

[*Id.* at 13.]

The resulting 1890 law, for the first time, standardized the physical arrangement of polling places and regulated those authorized to be present during voting.[6] *See L.* 1890, *c.* 231, § 46 (providing for "booths or compartments [to] be erected within a railed enclosure separating the same from the remainder of the [polling] room" and limiting presence of non-voters in polling room). More importantly, the 1890 law placed the first limitations on "electioneering" within 100 feet of the polling place. *See L.* 1890, *c.* 231, § 63. Section 63, the predecessor to the current *N.J.S.A.* 19:34–6, provided

*[t]hat no person shall do any electioneering on election day within any polling place, or publicly within one hundred feet of any polling place;* ... nor shall any person within the polling place or within a hundred feet thereof solicit the voter to show [the contents of a ballot].

[*L.* 1890, *c.* 231, § 63 (emphasis added).]

The overriding purpose of this new law was "to exclude unqualified persons" from polling areas and "to shield the legal voter from the influences of coercion or corruption." *Ransom v. Black,* 54 *N.J.L.* 446, 449, 24 *A.* 1021 (Sup.Ct.1892), *aff'd on other grounds,* 65 *N.J.L.* 688, 51 *A.* 1109 (E. & A.1900).

In 1898, the Legislature expanded Section 63 to bar—in addition to "electioneering"—the act of "obstruct[ing] or interfer[ing]" with a voter within 100 feet of a polling place and provided for penal sanctions. *See L.* 1898, *c.* 139, § 207. In 1930, the Legisla-

---

6 The Legislature was apparently so concerned with limiting the number of non-voters in or near polling places that the 1890 law required even those voters claiming "blindness or other physical disability" to take an oath certifying their disability before bringing a non-voter into the polling room to assist them in preparing the ballot. *L.* 1890, *c.* 231, § 48.

ture completed its reform efforts to ensure a limited zone outside a polling site where voters, before they cast their ballots, would not be subject to interference, either by appeals from the righteous or partisan hacks. *See generally L.* 1930, *c.* 187. Our current election-law statutes, *N.J.S.A.* 19:34–6, –7, and –15, date back to the work of the 1930 Legislature, which added loitering and the distribution of printed material as prohibited activities within the exclusionary zone. *See L.* 1930, *c.* 187, ¶¶ 438–39, 447. Those enactments, evolving from the original 1890 law, manifest the Legislature's intent to make the prohibitions on expressive activity within the 100–foot zone all encompassing.

## C.

The central objective of the statutes protecting the area around a polling site is to secure the franchise, to ensure that every citizen is encouraged to cast a vote on Election Day. The right to vote is among the most prized of all rights in a democracy. *See Bartlett v. Strickland,* —— *U.S.* ——, 129 *S.Ct.* 1231, 1240, 173 *L.Ed.*2d 173, 181 (2009) (noting that "right to vote" is "one of the most fundamental rights of our citizens"); *Reynolds v. Sims,* 377 *U.S.* 533, 562, 84 *S.Ct.* 1362, 1381, 12 *L.Ed.*2d 506, 527 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights...."). The right to vote holds an exalted position in our State Constitution. *N.J. Const.* art. I, ¶ 2 ("All political power is inherent in the people.... [T]hey have the right at all times to alter or reform the [government], whenever the public good may require it."). Notably, our State Constitution devotes an entire article enumerating the rights and duties associated with elections and suffrage. *See generally N.J. Const.* art. II.

*N.J.S.A.* 19:34–6, –7, and –15 were adopted specifically to ensure a minimal level of order and decorum and to reduce the potential for fraud, coercion, and confusion outside polling precincts on Election Day. In short, those statutes are aimed at maintaining the integrity of the electoral process. By the broad language of our election laws, the Legislature did not intend that, in the last 100 feet leading to the polling place, a voter would have to run, or

walk, a gauntlet of hawkers, hustlers, and protesters, or even pollsters shooting questions and voting-rights advocates handing out cards.

We thus conclude that *N.J.S.A.* 19:34–6, –7, and –15 bar both exit polling and the handing out of voting-rights cards within 100 feet of a polling site.[7] We now must decide whether barring those activities is consonant with the First Amendment rights of free speech and freedom of the press. We also must evaluate the Attorney General's position that exit polling, and only exit polling, is permissible within the exclusionary zone.

## V.

At this point, the paramount issue is whether our election-law statutes are fatally in conflict with the First Amendment. In addressing that issue, we are required to balance fundamental constitutional rights—the right to vote and the rights of free speech and freedom of the press. As written—not as interpreted in the Attorney General's 2007 Directive—*N.J.S.A.* 19:34–6, –7, and –15 are content-neutral time, place, and manner restrictions on expressive activities within the 100–foot zone leading to a polling place. As discussed, those statutes are intended to further the goal of encouraging open and free elections. The ACLU and Public Advocate, however, claim that the 100–foot exclusionary zone unnecessarily chokes off speech in violation of the First Amendment of the United States Constitution.

The First Amendment guarantees freedom from government suppression of speech or censorship.[8] *See Police Dep't of*

---

[7] The Legislature apparently has addressed, to some degree, the concerns expressed by the ACLU by providing for various forms of voter assistance on Election Day. *See, e.g., N.J.S.A.* 19:12-7.1(a) (requiring "voter's bill of rights" to be posted inside each polling place); *N.J.S.A.* 19:53A- 7(b) (providing that assistance shall be available to any voter requesting instructions prior to or after entering voting booth).

[8] The First Amendment provides that "Congress shall make no law .. abridging the freedom of speech, or of the press. . . ." *U.S. Const.* amend. I. The

*Chicago v. Mosley*, 408 *U.S.* 92, 95, 92 *S.Ct.* 2286, 2290, 33 *L.Ed.*2d 212, 216 (1972) ("[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). Like most rights, the rights protected by the First Amendment are subject to reasonable restrictions. *See Virginia v. Black*, 538 *U.S.* 343, 358, 123 *S.Ct.* 1536, 1547, 155 *L.Ed.*2d 535, 551 (2003) ("The protections afforded by the First Amendment . . . are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution.").

■ A statute may reasonably restrict the time, place, and manner of protected speech or expressive activity in a public forum so long as "the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 *U.S.* 781, 791, 109 *S.Ct.* 2746, 2753, 105 *L.Ed.*2d 661, 675 (1989) (quoting *Clark v. Cmty. for Creative Non–Violence*, 468 *U.S.* 288, 293, 104 *S.Ct.* 3065, 3069, 82 *L.Ed.*2d 221, 227 (1984)). Thus, the test in deciding the constitutionality of the content-neutral statutes at issue is whether proscribing all expressive activity within 100 feet of a polling site on Election Day (1) is "justified without reference to the content of the regulated speech," (2) is "narrowly tailored to serve a significant governmental interest," and (3) "leave[s] open ample alternative channels for communication of the information." *Ibid.* (citation and internal quotation marks omitted).

■ First, New Jersey's election laws, as written, are entirely content-neutral, forbidding all expressive speech, and therefore do

First Amendment applies to the states through the Fourteenth Amendment of the United States Constitution. *Thornhill v. Alabama*, 310 *U.S.* 88, 95, 60 *S.Ct.* 736, 740, 84 *L.Ed.* 1093, 1098 (1940). The New Jersey Constitution also provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." *N.J. Const. art.* I, ¶ 6.

not discriminate between permissible and non-permissible forms of speech. Those laws prohibit special-interest groups, regardless of the message they wish to deliver, from crowding outside the immediate area of a polling place and creating an obstacle for those exercising their right to vote. This State's election laws create a 100–foot unobstructed, protected pathway to a polling place for voters on Election Day. In that 100–foot walkway no person may solicit a voter, or interfere or engage in any expressive activity with a voter.[9]

Second, our election laws are "narrowly tailored to serve a significant governmental interest." *Ward, supra,* 491 *U.S.* at 791, 109 *S.Ct.* at 2753, 105 *L.Ed.2d* at 675 (citation and internal quotation marks omitted). That governmental interest is to promote the constitutional right to vote and ensure the reliability and integrity of the electoral process by establishing a limited obstacle-free zone for citizens casting their votes. New Jersey has decided that the last fifteen to twenty "seconds before its citizens enter the polling place should be their own, as free from interference as possible." *Burson, supra,* 504 *U.S.* at 210, 112 *S.Ct.* at 1857, 119 *L.Ed.2d* at 21 (plurality opinion).

New Jersey's historical experience with election fraud and intimidation outside of polling places was the impetus for the 100–foot exclusionary zone, and although our laws first prohibited only electioneering within that zone, *see L.* 1890, *c.* 231, sec. 63, the

---

[9] We agree with the Attorney General that even though all expressive activity is prohibited within the 100–foot exclusionary zone, de minimis speech, such as casual banter between voters about trivial subjects, *e.g.,* the weather, would not constitute an offense under our election laws. We disagree with the ACLU and Public Advocate that allowing such speech renders our election laws content-discriminatory and vests the government with unfettered discretion to determine the realm of permissible speech. For example, the United States Supreme Court has "never suggested that the kind of cursory examination that might be required to exclude casual conversation from the coverage of a regulation of picketing would be problematic." *Hill v. Colorado,* 530 *U.S.* 703, 722, 120 *S.Ct.* 2480, 2492, 147 *L.Ed.2d* 597, 615 (2000). We will not read our election-law statutes to reach absurd results. *See State v. Provenzano,* 34 *N.J.* 318, 322, 169 *A.2d* 135 (1961).

Legislature made the considered decision that interference by any means, including the solicitation of a voter, disparaged the electoral process, *see L.* 1930, *c.* 187, paras. 438–39. Thus, within 100 feet of a polling place, a voter does not have to wade through a sea of high-minded advocates voicing noble causes or mean-spirited partisans shouting divisive slogans. Our election laws maintain a pose of neutrality, not choosing one form of speech over another, but guaranteeing decorum and order immediately outside our polling sites. That is an atmosphere that will most likely encourage voters to come to the polls rather than be dissuaded, as occurred in the more distant past when party ruffians roamed outside of polling precincts to enforce the party line. *See McCormick, supra,* at 180.

The Legislature apparently has concluded that barring all activity—including expressive activity—within 100 feet of a polling place is the best means to protect voters from untoward interference. It is also the most effective and manageable means for election officials to insulate voters from tactics that might influence them or even dissuade them from coming to the polls, and takes those officials out of the business of acting as censors, determining what forms of speech would be acceptable outside of a polling precinct. Thus, *Ward*'s "narrowly tailored" test is met because our election laws promote a "substantial government interest that would be achieved less effectively" absent those laws. *Ward, supra,* 491 *U.S.* at 799, 109 *S.Ct.* at 2758, 105 *L.Ed.*2d at 680 (citation and internal quotation marks omitted).

The 100–foot exclusionary zone is not a recent innovation; it is the product of state laws first enacted in the late nineteenth century. *See L.* 1890, *c.* 231, § 63. The United States Supreme Court has deemed a 100–foot geographical ban on forms of expressive activity outside of a polling place within constitutional bounds. *See Burson, supra,* 504 *U.S.* at 210–11, 112 *S.Ct.* at 1857, 119 *L.Ed.*2d at 21–22. Similar 100–foot geographical bans are reflected in many contemporary state statutes. *See, e.g., Ark. Code Ann.* § 7–1–103(a)(9); *Cal. Elec.Code* § 18370; *Colo.Rev.*

*Stat.* § 1–5–105(1); *Colo.Rev.Stat.* § 1–13–714; *Fla. Stat.* § 102.031(4)(a); *Idaho Code Ann.* § 18–2318(1); 10 *Ill. Comp. Stat.* § 5/17–29(a); *Md.Code Ann., Elec. Law* § 16–206(b); *Mich. Comp. Laws* § 168.744; *Minn.Stat.* § 204C.06(1); *N.Y. Elec. Law* § 8–104(1); *Or. Rev. Stat.* § 260.695(2); *S.D. Codified Laws* § 12–18–3; *Tenn.Code Ann.* § 2–7–111(a)--(b)(1); *Tex. Elec.Code Ann.* § 61.003(a); *Wis. Stat.* § 12.03(b)(1); *Wyo. Stat. Ann.* § 22–26–113.

Third, barring all expressive activities within 100 feet of a polling place "leave[s] open ample alternative channels for communication of the information." *Ward, supra,* 491 *U.S.* at 791, 109 *S.Ct.* at 2753, 105 *L.Ed.*2d at 675 (citation and internal quotation marks omitted). The two expressive activities at the heart of this case are exit polling and the distribution of voting-rights cards. Exit pollsters and voting-rights advocates can operate at a distance of 101 feet from a polling site or conduct their activities through alternate means. That is not to say that those pollsters and voting-rights advocates might not have to work harder to achieve their ends. Restricting immediate access to voters will impede, to some extent, any person wishing to communicate with them, but that is the purpose of having a 100–foot exclusionary zone. It may well be that from a distance of 101 feet, exit polling or distributing pamphlets or political advocacy will not achieve its maximum desired effect, but that, standing alone, does not result in a constitutional deprivation. *See Gresham v. Peterson,* 225 *F.*3d 899, 906 (7th Cir.2000) ("An adequate alternative does not have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech." (citing *Ward, supra,* 491 *U.S.* at 802, 109 *S.Ct.* at 2760, 105 *L.Ed.*2d at 683; *Heffron v. Int'l Soc. for Krishna Consciousness,* 452 *U.S.* 640, 647, 101 *S.Ct.* 2559, 2563–64, 69 *L.Ed.*2d 298, 306 (1981))). Additionally, pollsters can conduct telephone surveys of people who live within a polling precinct.[10] Voting-rights advocates can hold up signs and pen-

---

[10] Telephone polling is a well-accepted practice in the polling industry. A pollster who is a voter can obtain "a computer-generated or electronic copy of a

nants carrying their messages. Of course, the restrictions covering polling sites only apply to Election Day, so voting-rights advocates have an entire year to educate the public.

All in all, New Jersey's content-neutral and narrowly tailored election laws, *N.J.S.A.* 19:34–6, –7, and –15, taken as a whole, do not offend any of the principles that undergird the First Amendment. That conclusion is fortified by the United States Supreme Court's seminal decision in *Burson v. Freeman*, which concluded that, to a reasonable extent, a state may " 'regulate conduct in and around the polls in order to maintain peace, order and decorum there.' " [11] 504 *U.S.* at 193, 112 *S.Ct.* at 1848, 119 *L.Ed.*2d at 11 (plurality opinion) (quoting *Mills v. Alabama*, 384 *U.S.* 214, 218, 86 *S.Ct.* 1434, 1437, 16 *L.Ed.*2d 484, 488 (1966)).

In *Burson*, the Court affirmed the constitutionality of a *content-based* Tennessee statute that prohibited electioneering within 100 feet of a polling entrance. 504 *U.S.* at 193–94, 211, 112 *S.Ct.* at 1848, 1857–58, 119 *L.Ed.*2d at 11, 22. Within that " 'campaign-free zone,' " the Tennessee statute specifically precluded " 'the display of campaign posters, signs or other campaign materials, distribution of campaign materials, and solicitation of votes for or against

---

list of registered voters in any or all election districts in [a] county." *N.J.S.A.* 19:31–18.1(b).

[11] Justice Blackmun wrote the plurality opinion for four members of the Court, including Chief Justice Rehnquist and Justices White and Kennedy. *Burson, supra*, 504 *U.S.* at 193, 112 *S.Ct.* at 1848, 119 *L.Ed.*2d at 10 (plurality opinion). Justice Kennedy, in a concurrence, noted that "there is a narrow area in which the *First Amendment* permits freedom of expression to yield to the extent necessary for the accommodation of another constitutional right." *Id.* at 213, 112 *S.Ct.* at 1859, 119 *L.Ed.*2d at 23–24 (Kennedy, J., concurring). To Justice Kennedy that principle applied in *Burson. Id.* at 213–14, 112 *S.Ct.* at 1859, 119 *L.Ed.*2d at 24. Justice Scalia also concurred in the judgment, asserting that the area surrounding a polling place constitutes a nonpublic forum, and thus, a statute restricting expressive activity within that area need only be reasonable and viewpoint-neutral to satisfy the First Amendment. *Id.* at 214–16, 112 *S.Ct.* at 1859–61, 119 *L.Ed.*2d at 24–25 (Scalia, J., concurring in judgment). Justice Stevens wrote a dissent, joined by Justices O'Connor and Souter. *Id.* at 217–28, 112 *S.Ct.* at 1861–67, 119 *L.Ed.*2d at 26–30 (Stevens, J., dissenting).

any person or political party or position on a question.' " *Id.* at 193–94, 112 *S.Ct.* at 1848, 119 *L.Ed.*2d at 11 (citation omitted).

Because the Tennessee statute restricted speech in a public forum based on content—excluding political speech and activity while allowing other forms of expression within 100 feet of a polling place—the Court's plurality opinion, written by Justice Blackmun, applied an "exacting scrutiny" to determine whether the statute could be reconciled with the dictates of the First Amendment. *Id.* at 198, 112 *S.Ct.* at 1851, 119 *L.Ed.*2d at 13–14. Justice Blackmun concluded that Tennessee had a compelling state interest to impose restrictions that would protect not only "the right of its citizens to vote freely for the candidates of their choice," but also to ensure "the integrity and reliability" of an election itself. *Id.* at 198–99, 112 *S.Ct.* at 1851–52, 119 *L.Ed.*2d at 14–15.

Justice Blackmun surveyed the historical record of election improprieties surrounding polling precincts, *id.* at 200–06, 112 *S.Ct.* at 1852–55, 119 *L.Ed.*2d at 15–19, observing that "all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments," *id.* at 206, 112 *S.Ct.* at 1855, 119 *L.Ed.*2d at 19. The plurality rejected the argument that Tennessee's regulation was overinclusive because the statute could have been narrowed to preclude the "use [of] violence or intimidation to prevent voting." *Ibid.* The plurality explained that "undetected or less than blatant acts may nonetheless drive the voter away before remedial action can be taken." *Id.* at 207, 112 *S.Ct.* at 1855, 119 *L.Ed.*2d at 19. Moreover, it rejected the argument that the statute was underinclusive for not restricting other types of speech. *Id.* at 207, 112 *S.Ct.* at 1855–56, 119 *L.Ed.*2d at 19–20.

Last, the plurality considered the 100–foot buffer zone to be a "minor geographic limitation" and not a "significant impingement" of a constitutional right. *Id.* at 210, 112 *S.Ct.* at 1857, 119 *L.Ed.*2d at 21. Whether Tennessee's 100–foot restrictive zone could have

been more narrowly delineated constituted merely a difference in degree and not "a question of constitutional dimension." *Ibid.* (citation and internal quotation marks omitted).

Clearly, if the Tennessee 100–foot content-based exclusionary zone survives constitutional scrutiny, then New Jersey's 100–foot content-neutral one must as well. Interestingly, Justice Stevens's dissent, in chiding the plurality for upholding "Tennessee's differential treatment of campaign speech," makes the case in favor of New Jersey's election laws. *Id.* at 225, 112 *S.Ct.* at 1865, 119 *L.Ed.*2d at 30 (Stevens, J., dissenting). Justice Stevens observed that "[a]ccess to, and order around, the polls would be just as threatened by the congregation of citizens concerned about a local environmental issue not on the ballot as by the congregation of citizens urging election of their favored candidate" and that "disorder could just as easily be caused by a religious dispute sparked by a colporteur as by a campaign-related dispute sparked by a campaign worker." *Ibid.*

The drafters of New Jersey's election laws came to the obvious determination that any interference with a voter near a polling place, whatever the motivation, whether political, nonpartisan or charitable, is too great an infringement on the constitutional right to vote. We do not find that the legislative scheme banning expressive activity within 100 feet of a polling precinct conflicts with the First Amendment. We conclude that *N.J.S.A.* 19:34–6, –7, and –15 do not suppress expressive speech, but rather are reasonable time, place, and manner restrictions that accommodate competing constitutional rights—the right to vote and the rights of freedom of speech and of the press.[12]

## VI.

 We do not agree with the Attorney General's position that the Constitution confers on exit polling some exalted status

---

[12] Nothing in our jurisprudence concerning the free speech and free press guarantees of the New Jersey Constitution, *N.J. Const.* art. I, ¶ 6, alters the outcome we reach today. *Cf. State v. Lashinsky,* 81 *N.J.* 1, 404 A.2d 1121 (1979).

that sets it apart from all other forms of expressive activity. Although exit polling is accorded constitutional protection as an expressive activity and plays an important role in providing societal and demographic information to the public, it is not entitled to preferential treatment under the First Amendment.[13] Indeed, political speech, arguably, has a higher claim to First Amendment protection because "[p]olitical speech . . . is at the core of what the First Amendment is designed to protect." *Morse v. Frederick,* 551 *U.S.* 393, 403, 127 *S.Ct.* 2618, 2626, 168 *L.Ed.*2d 290, 300 (2007) (citation and internal quotation marks omitted). Yet, we know that political speech may be constitutionally curtailed within 100 feet of a polling site. *See Burson, supra,* 504 *U.S.* at 198, 210–11, 112 *S.Ct.* at 1851, 1857–58, 119 *L.Ed.*2d at 13–14, 21–22 (plurality opinion).

Exit polling presents as serious a concern as any other form of expressive activity within the prohibited zone. *Id.* at 223–24, 112 *S.Ct.* at 1864, 119 *L.Ed.*2d at 30 (Stevens, J., dissenting) ("[E]xit polling . . . presents at least as great a potential interference with orderly access to the polls as does the distribution of

---

13 Our election-law statutes prohibit all expressive activities within the 100–foot zone and do not distinguish between non-partisan pollsters and media representatives. Moreover, exit polling, whether conducted by a media representative or a non-partisan voting-rights group, poses the same potential problems presented by other expressive activities. The right to freedom of the press, as with other First Amendment rights, is subject to reasonable time, place, and manner restrictions. *See Lashinsky, supra,* 81 *N.J.* at 13, 404 *A.*2d 1121; *see also Cohen v. Cowles Media Co.,* 501 *U.S.* 663, 669–70, 111 *S.Ct.* 2513, 2518, 115 *L.Ed.*2d 586, 596-97 (1991) ("[G]enerally applicable laws do not offend the *First Amendment* simply because their enforcement against the press has incidental effects on its ability to gather and report the news."). Here, the time, place, and manner restriction is intended to vindicate the valued constitutional right to vote, even though it may make it more difficult for media and non-media pollsters to gather data. "The right to speak and publish does not carry with it the *unrestrained* right to gather information." *Zemel v. Rusk,* 381 *U.S.* 1, 17, 85 *S.Ct* 1271, 1281, 14 *L.Ed.*2d 179, 190 (1965) (emphasis added); *see also Lashinsky, supra,* 81 *N.J.* at 13, 404 *A.*2d 1121 ("[T]he constitutional prerogatives of the press must yield, under appropriate circumstances, to other important and legitimate government interests.").

campaign leaflets, the display of campaign posters, or the wearing of campaign buttons."). A basic tenet of all elections is the right of a voter to cast a secret ballot, and yet, under the Attorney General's Directive, exit pollsters may stand immediately outside a polling place and pose questions about how a voter cast his ballot. Exit pollsters may also solicit from a voter highly sensitive information on subjects such as race, religion, and economic status. To some voters, a pollster blocking their way and posing intrusive questions may constitute a form of interference at least as great as a person handing out pro-choice or pro-life literature or a person advocating in opposition to or support of gun control. Additionally, the closer a pollster is positioned to a polling site the more likely a voter entering the site may be inadvertently or involuntarily exposed to another voter's ballot choices or opinions on candidates or public matters. Whether it is the presence of exit pollsters, voting-rights advocates, or special-interest exponents, the same concerns are raised regarding congestion and distraction outside the polling place and the potential disincentive to voters to walk through that thicket. Although exit pollsters perform an important function, advocates for other causes do so as well. The 100–foot ban applies to all, however laudable their goals.

To justify carving out an exception for exit polling in the 100–foot exclusionary zone, the Attorney General in 1988 relied on *Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir.1988). However, in *Munro*, the Ninth Circuit Court of Appeals struck down on First Amendment grounds a Washington State content-based statute that specifically targeted exit polling for non-preferred treatment. *Id.* at 382–83, 386. The statute, while permitting other forms of expressive activity, prohibited any person, within 300 feet of a polling place, from " '[c]onduct[ing] any exit poll or public opinion poll with voters.' " *Id.* at 382–83 (citation omitted). New Jersey's election laws do not discriminate, as did Washington State's, against exit polling. It is one thing for a statute to single out exit polling for differential treatment from other forms of

speech; it is another thing, as here, for the Attorney General to make exit polling the one constitutionally preferred form of expressive activity in a statutory scheme that bars all expressive activity.[14]

The Attorney General did not have a constitutionally sound basis to breach the election laws by allowing exit polling. The ACLU and Public Advocate now pivot off of that breach, arguing that the Attorney General's Directive, having opened the exclusionary zone to some speech, has created a constitutionally invalid content-based regulation. *See R.A.V. v. St. Paul,* 505 *U.S.* 377, 382, 112 *S.Ct.* 2538, 2542, 120 *L.Ed.*2d 305, 317 (1992) ("Content-based regulations are presumptively invalid."). The ACLU and Public Advocate contend that if exit polling is permitted, so must the dissemination of voting-rights materials. And, as the Public Advocate conceded at oral argument, if voting-rights cards can be distributed, the zone must be extended to other forms of speech, even speech that he might find hateful. If we were to sanction exit polling, there is no persuasive argument for precluding other forms of expressive activity within the 100–foot exclusionary zone. The inexorable logic of the argument of the ACLU and Public Advocate leads to the substitution of the 100–foot zone for a no-man's land of pollsters, protesters, and peddlers on Election Day. We agree with the ACLU and Public Advocate that the Attorney

---

[14] In addition, the Attorney General also relied on the United States District Court for the Southern District of Florida's decision in *CBS Inc. v. Smith,* 681 *F.Supp.* 794 (S.D.Fla.1988). *See also ABC Inc. v. Blackwell,* 479 *F.Supp.*2d 719 (S.D.Ohio 2006) (granting injunction to allow exit polling within 100 feet of polling place). To the extent that a few federal district courts suggest that exit polling is the one form of expressive activity constitutionally permitted in an exclusionary zone around a polling place that otherwise prohibits *all* expressive activity, we respectfully disagree for the reasons expressed in our opinion. A judge's mere disagreement with a legislative determination "concerning the most appropriate method for promoting significant government interests or the degree to which those interest should be promoted" is not a basis for striking down a valid time, place, and manner regulation. *Ward, supra,* 491 *U.S.* at 800, 109 *S.Ct.* at 2758, 105 *L.Ed.*2d at 681 (citation and internal quotation marks omitted).

General cannot be a self-appointed censor of the content of speech permitted within the 100–foot zone.

The simple solution is that our election laws, which are content-neutral, non-discriminatory, and, as we have declared, constitutional, must be enforced as they were written, barring all expressive activity within the area near a polling place. Therefore, exit polling, the dissemination of voting-rights materials, and other expressive activities are forbidden in the 100–foot zone. The last 100 feet leading to a polling place belong to the voters on Election Day.

## VII.

For those reasons, we modify and affirm the judgment of the Appellate Division. New Jersey's election laws, *N.J.S.A.* 19:34–6, –7, and –15, provide a comprehensive, non-discriminatory scheme for regulating the area within 100 feet of a polling place. That scheme bans all expressive activity, including exit polling and the handing out of voting-rights cards. Our election laws constitute reasonable time, place, and manner restrictions on expressive activities that accommodate the constitutionally protected right to vote.

*For affirmance as modified*—Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS—6.

*Opposed*—None.